[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 865 
[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 866 
Gerald Len Vogel and Robert Louis Vogel were each indicted in Montgomery County for fourteen counts of violating the Alabama Uniform Controlled Substances Act by being in possession of a number of different controlled substances seized by Montgomery police officers from the Vogels' car on May 30, 1979. § 20-2-70
(a), Code of Alabama 1975. Because of the identical nature of the facts and issues, the two defendants agreed that their cases be consolidated for trial, and further waived a trial by jury, instead submitting their combined cases to the trial court for determination. Both defendants were found to be guilty as charged by the trial court with respect to eleven of the fourteen counts, and the court granted the State's motion to nol pros the remaining three counts as to each defendant. The court sentenced Gerald Vogel to consecutive terms of fifteen and five years imprisonment on the first two counts respectively, and imposed fifteen year terms for each of the remaining counts, to run concurrently with the initial consecutive terms. Robert Vogel was sentenced to three fifteen and one five year term, to be served consecutively, on the first four counts of his indictment, and to fifteen year terms for each of the remaining counts, to be served concurrently with the consecutive sentences. From such judgments and sentences, both Vogels now prosecute this appeal.
Initially, the trial court received evidence on appellants' motion to suppress the evidence of the drugs seized from the car, but appellants later agreed that the trial court consider such evidence in its determination of appellants' guilt or innocence. The first witness for the State was Officer L of the Montgomery Police Department, who testified that, on the morning of May 30, 1979, he and Officer P had been on routine patrol in their marked police vehicle on Narrow Lane Road south of Montgomery's Southern By-Pass. At approximately 10:00 o'clock, the officers turned onto Allenport Road, a dirt "circular type road" which intersects Narrow Lane Road in two places and apparently runs back to an abandoned or seldom used airstrip. Officer L described the area as somewhat rural and sparsely populated, with only a few houses and Conway Lumber Company in the immediate vicinity; it further appears that there were no inhabited structures along Allenport Road itself. As they drove down Allenport Road, Officer L stated, he noticed through some trees that an automobile was parked on a branch road leading to the airstrip. Officer L testified that he then turned the police car onto the branch road and drove toward the parked car and that as he did so, he saw "a subject throw a plastic bag down on the ground" (R. 10), and a second individual standing at the rear of the car with the trunk open. The officer stated that he had on several prior occasions run across persons "hunting squirrel out of season", "love *Page 867 
making," "drinking beer," and the like (R. 9), and thus he stopped the police car, got out and approached the parked car. As he did so, he witnessed two individuals "appearing to fumble with something in the trunk," at which point Gerald Vogel walked around to the front of the car and Robert Vogel "slammed" the trunk lid shut "as if . . . [to] get it closed before we got back there" (R. 11). Upon questioning, one of the pair stated that they were there to dump some trash, despite the posted signs prohibiting dumping, but would not do so now that the officers were there. Officer L testified that he glanced around the car, but that he saw no trash other than the plastic bag, so he asked Robert Vogel if he could look in the trunk, a request refused by Vogel. The officer stated that, after procuring identification from the two, and recognizing Robert Vogel's name from prior police contacts, and upon again being refused permission to examine the trunk, he told Officer P to radio for an investigator. Several minutes later, Investigator N arrived, and Officer L stated that he informed N of the situation; Robert Vogel again denied the officers permission to look in the trunk, stating that they would have to get a search warrant to do so. During this colloquy, Officer L testified, Gerald Vogel acted "fairly normal," while Robert was "extremely nervous" and "sweating heavily" and attempted to remain at or near the trunk at all times (R. 17).
Officer L then testified that, prior to the arrival of Investigator N, he looked into the interior of the car and saw three "Army type duffel bags" stuffed with "brick" shaped objects lying on the back seat, and a police scanner and walkie-talkie in the front seat area. After N arrived, Officer L stated that he examined the plastic bag which had been discarded and was lying on the ground, and deduced from the affixed price tag that it might have come from Conway Lumber Company, a store located at one intersection of Allenport and Narrow Lane Roads. Leaving P, N and the two appellants, Officer L drove to Conway and showed an employee the plastic bag, and, according to L, the employee stated that two white males driving a gold car had earlier entered the store at two different times and purchased duffel bags. The employee placed the times of these visits to have been within thirty minutes of the officer's visit, and identified the bags as three plain and two camouflaged canvas duffel bags. The two males had then driven down Allenport Road toward the airstrip. Officer L then testified that he returned with this information to the scene of the parked car and talked with N, and both decided that Robert Vogel would be arrested for littering. After doing this, the officers attempted to open the trunk to look for "the trash that would have been involved with the bag that we found" (R. 21), but Robert Vogel resisted their attempts and finally was handcuffed. Robert Vogel continued to interfere by blocking access to the trunk, according to Officer L, so he was placed in the back of the police car; from there he escaped and returned to the trunk of his car, and removed the keys from the trunk lock. Officer L testified that he located the keys behind the back seat of the police car, but Robert Vogel had rendered them unusable, and the trunk could not then be opened. During all of this, L stated, Gerald Vogel had not been placed under arrest.
At this point, L and N entered the car and removed the duffel bags, and upon opening them discovered the controlled substances. Both Vogels were then transported to the police station, and the car towed there by a wrecker. Officer L stated that, at the time, he thought that the bags contained marijuana bricks because of the rectangular imprints, but that in any event he "knew there was something wrong" (R. 27). Under questioning from the court, Officer L stated that he did not believe that appellants had purchased several "seven or eight dollar" duffel bags "to put old trash in to throw out on the ground" (R. 31). He also stated that, from his police experience, he knew generally what a brick of compressed marijuana looked like. Officer L then testified that he and Officer N executed affidavits and secured a search warrant for the trunk of the car. He also identified a number *Page 868 
of photographs of the scene and the car, and identified the plastic bag he had picked up.
On cross-examination by counsel for appellants, Officer L acknowledged that, at the time he had had no reports of any burglaries or robberies in the area, but that he did not remember telling Officer P to radio for a property crimes investigator. He further stated that he did not remember calling the plastic bag to the attention of Officer P as they approached appellants' car, although he reiterated that he had definitely seen Robert Vogel toss the bag onto the ground. Officer L testified that he only mentioned the bag to the Vogels some twenty minutes after he first talked to them in connection with Robert's arrest for littering. He further stated that he summoned Investigator N for "investigative advice" in regard to the car, but that he did not know that N was a property crimes investigator.
Officer L further stated under questioning from the court that he knew of Robert Vogel's past brushes with the law involving buying, receiving and concealing stolen property, and drugs. He also stated that he was familiar from his training
with the use of isolated airstrips as a "way out for contraband" (R. 61).
On re-direct examination, the officer testified that he knew that appellants had purchased five bags, but that only three were visible inside the car. On re-cross, he acknowledged that neither appellant had told him that the bags contained trash.
Montgomery Police Investigator N testified that, on May 30, 1979, he had been summoned by radio to the Allenport Road area and that, upon arrival, he had occasion to see appellants, as well as Officers L and P. He stated that, upon looking into the parked car at the scene, he saw a police scanner and three duffel bags filled with rectangular objects. Further, Investigator N said, he asked Robert Vogel for permission to look into the trunk, which permission was denied by Vogel, who told N to get a search warrant. At that point, Officer L showed N the plastic bag, and then left the scene to go to Conway Lumber Company. Investigator N stated that, during this time, Robert Vogel was extremely nervous and paced about. Upon L's return from Conway, Robert Vogel was placed under arrest for littering, and the keys to the car removed from his pocket. Investigator N further stated that he had formed an opinion that the bags in the back seat area contained "kilo bricks of marijuana" (R. 74), although the possibility of stolen property was discussed as well with Officer L. As he attempted to open the trunk of the car, N stated, Robert Vogel began interfering and was handcuffed after a struggle; he then knocked N down and had to be subdued by N and L, who placed him in the police car. From there, Vogel escaped, was subdued and returned to the car, at which point Investigator N discovered the key to be missing from the Vogels' car trunk lock. Investigator N testified that Officer L then located the keys in the police car, but they were unusable. He further stated that at no time did he know where the ignition key to the car was, and to his knowledge the Vogels' car was operational. Investigator N and Officer L then entered the car and discovered the drugs, then placed both Vogels under arrest, advising them of their rights at that time. Investigator N further testified that he was familiar with Robert Vogel's name as one having been involved in drug dealings.
On cross-examination, Investigator N stated that he thought that Officer P had handcuffed Gerald Vogel during the struggle with Robert Vogel, though Gerald was not formally arrested until the drugs were discovered. N reiterated that he thought that the bags contained marijuana bricks, based upon his experience and the reputation of Robert Vogel. He also stated that Officer L had not told him at the scene that he had seen Robert Vogel throw down the plastic bag, but that he had reached that conclusion after seeing the bag on the ground. Investigator N further testified that he and Officer L had talked about the Vogels at the scene, and that L had told him that Robert had been involved with *Page 869 
stolen property on a prior occasion. The two officers further discussed whether the duffel bags contained stolen property or marijuana bricks, and then L arrested Robert for littering. Investigator N further stated that, though Gerald Vogel was not under arrest during all of this, he was not told by N that he was free to leave.
On re-direct examination, the officer stated that he had been afraid at one point that either or both of the Vogels might attempt to escape. He also testified that, in his police experience, he had been involved in narcotics work and had participated in arrests and searches involving vehicles and airplanes. He stated that he was familiar with the methods of packaging drugs and what such packaging looked like, and further that private isolated airports were frequently used to smuggle such contraband. He also described the area around the Allenport airstrip as secluded and heavily wooded.
At this point, the State rested on the motion to exclude, and Officer P was called by the defense. Officer P testified that he had been working with Officer L on May 30, 1979, when Officer L pointed out a parked car on Allenport Road. As they approached, Officer P stated, he could see appellants "shuffling some stuff around in the trunk of the car" (R. 110), but he did not see either one throw down any litter, nor did Officer L mention such an occurrence to him. Officer P stated that he did not know of the plastic bag until after Investigator N had arrived and Officer L showed him the bag. The officer further testified that Officer L told him to radio for a property investigator, although he did not know why. Officer P also stated that he witnessed the scuffle between Robert Vogel and Officers N and L, and that he kept an eye on Gerald Vogel, who the officer stated was not free to leave; he then handcuffed Gerald Vogel to prevent him from entering the affray, although Gerald was not under formal arrest.
On cross-examination by the State, Officer P stated that he had no intention of arresting Gerald Vogel before the drugs were found, but that he did not know whether Gerald Vogel had access to an ignition key for the car. He further stated that, when the officers had first approached the parked car, Gerald Vogel had come forward to meet them and Robert had stayed at the trunk and had then slammed it shut. The officer also stated that Robert Vogel grew increasingly nervous as time went by, and refused to allow anyone to examine the interior of the trunk, saying that there was only "trash" in the trunk. He further stated that he continued to watch Gerald Vogel, because he did not know whether he would run or assault him. Officer P also testified that, though he had seen the duffel bags, he did not have "any idea" what they contained.
C.D. Sherlin was called by the defense, and testified that, though he was now an investigator with the Attorney General's Office, he had earlier been employed as a major with the Montgomery Police Department, as head of the investigative division. Mr. Sherlin stated that he was familiar with Officer L through the Police Department and that he would trust L. He further stated that he considered Officer L to have a good reputation, but that he was familiar with an incident where L had lied in connection with the loss of police property. Further attempts by the defense to develop this line of inquiry were objected to by the State, which objections were sustained by the court.
Charles Swindall, Chief of Police of Montgomery, testified for the defense that he was familiar with Officer L, and that his overall reputation was good, with the exception of one incident. Chief Swindall stated that he was familiar with an incident where L had falsified a report, but further questioning was also objected to and the objections sustained.
James D. Foster, a lieutenant in the same department, testified that he was acquainted with Officer L, and that L had a favorable reputation for truth and veracity. Lieutenant Foster further stated that he had talked with L at the scene of the Vogels' arrest on May 30, 1979, and that L had *Page 870 
mentioned that he had observed one of the Vogels throw some litter on the ground. Lieutenant Foster further testified that he had called a press conference after the events of May 30, and thought that he had told representatives of the news media about the littering aspect of the case. He did not know whether the littering had been mentioned in the police report.
Officer N was re-called at this point as an adverse witness, but the court disallowed questioning as to whether the police reports contained mention of the littering.
Norman Lumpkin, a television news reporter employed by WSFA television in Montgomery, testified for the defense that he had attended a news conference on the day that the Vogels were arrested at Police Headquarters, and that, to his knowledge, nothing had been said at the news conference about any littering by the Vogels.
Rhodes Johnston, a police reporter for the Alabama Journal
newspaper, testified for the defense that he did not attend the news conference at Police Headquarters that day, and was excused. At this point, the defense rested on the motion to suppress, and arguments were made by both the State and the defense, after which the trial court denied the motion to suppress because it determined that "probable cause" and "exigent circumstances" existed to justify the officers' actions (R. 169). The defense having agreed that the trial court could consider the evidence presented during the suppression hearing as evidence on the question of guilt, the State then called several more witnesses.
Michael Wilson, a vice and narcotics officer with the Montgomery Police Department, testified that, on the morning of May 30, 1979, he had been summoned by radio to the Allenport Road, and, upon arrival talked to Officer L. Officer Wilson stated that he "kept watch" over a car parked at the scene, and later followed the car as it was towed by wrecker to the Police Station; he then stayed with the car until a search warrant was obtained. The officer further testified that he remained with the vehicle at all times until he turned over his control to an Officer Totty, and that no one entered the vehicle while he was watching it.
Under cross-examination, the officer stated that, though he did not think any one had entered the car, he could not "swear" that it had not been entered.
On re-direct examination, Officer Wilson identified the appellants as the two individuals who had been under arrest when he had arrived at the Allenport Road scene.
T.G. Totty, a senior evidence technician with the Montgomery Police Department, stated that, as part of his job, he collected and photographed all physical evidence relating to crimes investigated by the Police Department. He testified that, on May 30, 1979, he had been advised that a car requiring processing would be towed into Police Headquarters. Corporal Totty further testified that, when the car arrived, "every supervisor that was in that building was standing there" (R. 179), but that he did not specifically remember seeing Mike Wilson. The officer stated that one of the appellants was then brought to where the car was parked and read the contents of a search warrant, after which a locksmith opened the trunk of the car. Upon the opening of the trunk, Corporal Totty testified, he saw "loose drugs" and "all kinds of paraphernalia" (R. 181) lying in the trunk. The evidence from the trunk, as well as from the back seat, was labeled and transported to the technicians' section. Because of the amount of evidence involved, Corporal Totty stated that it was placed into a safe and sealed shut until the next morning, when the inventorying process was begun. Corporal Totty further testified as to the chain of custody followed between the inventory and the time of trial, and further stated that Allen Adair of the Toxicologist's Office had taken samples of all of the drugs for analysis.
Allen Adair, a criminalist with the State Department of Forensic Sciences, Montgomery Division, after testifying as to his qualifications and experience in testing drugs, stated that he had removed representative samples of various types of drugs from the drugs removed from the Vogels' *Page 871 
automobile. He further testified as to the chain of custody over the samples, and stated that he had analyzed the samples. The witness identified the various samples as containing cocaine, codeine [methylmorphine], alphaprodine, amphetamine, methadone, pethidine, morphine, phenmetrazine, ethylmorphine, methyqualone, oxymorphone, and hydramorphone. He did not identify any drugs containing ambarbital and secobarbital, opium, or preparation of opium, and the respective counts of the indictments relating to those drugs were nol prossed.
Investigator N was recalled by the State, and testified that appellants were the individuals present at the scene on Allenport Road on May 30, 1979.
The various drugs identified by Mr. Adair were received into evidence, at which point the State rested. No further witnesses were called by appellants, and neither of them testified at trial.
 I
It is the first contention of the appellants that the trial court committed reversible error in overruling their motion to suppress the evidence of the drugs seized from the back seat and trunk of their automobile by Montgomery police officers. To this end, appellants assert that the initial and concededly warrantless search of the interior of the vehicle while it was parked on Allenport Road, which search revealed numerous cartons of drugs concealed in three duffel bags on the back seat, was unconstitutional under the Fourth Amendment's proscription against unreasonable searches and seizures. If appellants are correct in their argument, then admittedly the drugs seized from the car's trunk pursuant to a later-acquired search warrant [which, appellants concede, was based upon probable cause arising "out of matters observed during the initial warrantless search"] must likewise be suppressed as "fruit of the poisonous tree." Silverthorne Lumber Company v.United States, 251 U.S. 385, 40 S.Ct. 182, 64 L.Ed. 319 (1920);Wong Sun v. United States, 371 U.S. 471, 83 S.Ct. 407,9 L.Ed.2d 441 (1963); Duncan v. State, 278 Ala. 145,176 So.2d 840 (1965).
In dealing with police activity within the ambit of the Fourth Amendment, we are mindful that "`searches conducted outside the judicial process, without prior approval by judge or magistrate, are per se unreasonable under the Fourth Amendment — subject only to a few specifically established and well-delineated exceptions,'" Mincey v. Arizona, 437 U.S. 385,98 S.Ct. 2408, 57 L.Ed.2d 290 (1978), quoting Katz v. UnitedStates, 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967), which "exceptions" are generally recognized to be plain view, consent, incident to a lawful arrest, in hot pursuit or similar emergency situations, under probable cause coupled with exigent circumstances, and in stop and frisk situations. Daniels v.State, 290 Ala. 316, 276 So.2d 441 (1973); Richardson v. State, Ala.Cr.App., 376 So.2d 205 (1978), affirmed, Ala.,376 So.2d 228 (1979); Baker v. State, Ala.Cr.App., 340 So.2d 854, cert.denied, Ala., 340 So.2d 860 (1976). A seventh "exception" is now recognized as well in instances of "inventory" searches made to secure valuables or similar items. South Dakota v.Opperman, 428 U.S. 364, 96 S.Ct. 3092, 49 L.Ed.2d 1000 (1976);Wilkinson v. State, Ala., 374 So.2d 400 (1979). Appellants, however, while apparently acknowledging these exceptions to the warrant requirement, nevertheless argue that the situation here presented does not properly fit any of the above-stated categories and that, in any event, none of the exceptions would justify a warrantless search of the duffel bags contained in the interior of the car.
Initially, appellants seem to contend that Officers Lindsey and Pilgreen had no legitimate reason to stop their patrol vehicle and investigate the activities of appellants on the Allenport Road that morning, citing in support of this proposition United States v. Beck, 602 F.2d 726 (5th Cir. 1979). In Beck, the Fifth Circuit held that the mere fact that two men were sitting in a parked car with its engine running on a midsummer's day in a housing project was "not inherently suspicious" and thus the *Page 872 
"mere unfounded feeling that something might be afoot" was no justification for even an investigatory stop by the police, which stop had eventually culminated in defendant's arrest. It is, of course, well recognized, and so acknowledged in Beck, that police may constitutionally detain an individual for brief periods of questioning "on a reasonable suspicion, based on objective facts, that the individual is involved in criminal activity." Brown v. Texas, 443 U.S. 47, 99 S.Ct. 2637,61 L.Ed.2d 357 (1979); Terry v. Ohio, 392 U.S. 1, 88 S.Ct. 1868,20 L.Ed.2d 889 (1968); § 15-5-30 et seq., Code of Alabama 1975;Fennell v. State, 51 Ala. App. 23, 282 So.2d 373, cert. denied,291 Ala. 778, 282 So.2d 379 (1973). The standard of "reasonable suspicion" employed in such instances will, because of the minimally intrusive nature of the procedure contemplated, justify such a limited stop upon facts which demonstrate something less than full probable cause. Bagony v. City ofBirmingham, Ala.Cr.App., 371 So.2d 80 (1979); Luker v. State, Ala.Cr.App., 358 So.2d 504 (1978).
From our examination of the record, we conclude that though, in a sense, appellants were in fact stopped or "seized" within the scope of Terry v. Ohio, supra, by virtue of the appearance that they were "not free to ignore the officer[s] and proceed on [their] way," United States v. Pope, 561 F.2d 663 (6th Cir. 1977), there were present here, unlike in Beck, specific and articulable facts which could give rise to a "reasonable suspicion" that appellants were engaging in criminal mischief. Briefly, two officers on routine patrol encounter a car parked in the middle of a road leading to an isolated airstrip, and it is evidence that two men are fumbling around in the opened trunk of the car. Officer L testified that he had, on several prior occasions, apprehended individuals for violation of various laws at that particular site. Here, Officer L stated that he actually saw one of the appellants discard a plastic bag onto the ground by the car, despite the posted signs prohibiting "trash dumping" and the laws designating littering as a violation. § 23-5-5, Code of Alabama 1975; Montgomery, Ala., Code § 39-4. The fact of littering alone, as a misdemeanor committed in the officers' presence, would justify the officers in stopping and investigating this action, and even arresting the offender if they thought that course of action necessary. § 15-10-3, Code of Alabama 1975. We find that the officers merely stopped their car and questioned appellants as to their activities, a minimally intrusive procedure under these circumstances, and indeed "it would have been poor police work . . . to have failed to investigate this behavior further." Terry v. Ohio, supra. There was nothing impermissible about the course of action pursued by the officers.[1]
Given the propriety of the officers' action in initiating their somewhat cursory investigation of appellants' behavior, appellants still argue that the resulting search and seizure which netted the three duffel bags stuffed with cartons of drugs and thus provided the probable cause for the later-acquired warrant to search the trunk was made without probable cause and in the absence of any exigent circumstances. Initially, it is obvious from the unrebutted testimony of the officers involved and the photographs received into evidence at the hearing that the duffel bags were plainly visible through the windows of the car when the officers approached, and that at no time were the officers required to open the car doors or perform other such actions in order to actually see the bags. In the context of the Fourth Amendment, "a `search' implies probing into secret places for that which is hidden [and] implies force, actual or constructive, or a forceable dispossession of property of one by exploratory acts."Cunningham v. State, 52 Ala. App. 440, 293 So.2d 865 (1974);Knox v. State, 50 Ala. App. 494, 280 So.2d 200 (1973). Clearly, *Page 873 
the discovery of these bags, lying as they were on the back seat of a car parked on a public road and in the obvious view of anyone who happened to pass by, was not the product of any "search" by the officers. Vincent v. State, 284 Ala. 242,224 So.2d 601 (1969); Butler v. State, Ala.Cr.App., 380 So.2d 381
(1980); Packer v. State, 55 Ala. App. 30, 312 So.2d 601 (1975);Osner v. State, 54 Ala. App. 520, 310 So.2d 241 (1974), cert.denied, 293 Ala. 769, 310 So.2d 247, cert. denied,423 U.S. 871, 96 S.Ct. 137, 46 L.Ed.2d 101 (1975); Powers v. State,49 Ala. App. 690, 275 So.2d 369 (1973); Marshall v. United States,422 F.2d 185 (5th Cir. 1970).
Although we are of the opinion that, from the facts, no "search" occurred relative to the discovery of the three duffel bags, we are still confronted with the question as to whether the officers then had the legitimate right to enter the vehicle, seize the bags, open them and confiscate the drugs. Despite language in Harris v. United States, 390 U.S. 234,88 S.Ct. 992, 19 L.Ed.2d 1067 (1968), that "objects falling in the plain view of an officer who has a right to be in the position to have the view are subject to seizure," we find that such seizures must be governed by the subsequent decision ofCoolidge v. New Hampshire, 403 U.S. 443, 91 S.Ct. 2022,29 L.Ed.2d 564 (1971). In that case, the Supreme Court had occasion to consider seizures of items found inadvertently in "plain view" during searches pursuant to some prior legitimate intrusion [such as under the color of a warrant or in "hot pursuit"], technically inapposite to the present case in that we have determined that no "search" or initial prior intrusion in fact occurred, see Scales v. State, 13 Md. App. 474,284 A.2d 45 (1971). The Court did, however, set forth the following tenet regarding the seizure of such evidence, "whether contraband or stolen goods or objects dangerous in themselves," applicable in circumstances such as these:
 ". . . plain view alone is never enough to justify the warrantless seizure of evidence. This is simply a corollary of the familiar principle * * * that no amount of probable cause can justify a warrantless search or seizure absent `exigent circumstances.' Incontrovertible testimony of the senses that an incriminating object is on premises belonging to a criminal suspect may establish the fullest measure of probable cause. But even where the object is contraband, this Court has repeatedly stated and enforced the basic rule that the police may not enter and make a warrantless seizure."
Compare Taylor v. United States, 286 U.S. 1, 52 S.Ct. 466,76 L.Ed. 951 (1932) [warrantless entry to seize evidence in open view unconstitutional]; with Steele v. United States,267 U.S. 498, 45 S.Ct. 414, 69 L.Ed. 757 (1925) [evidence in open view could furnish probable cause for issuance of warrant]. We thus must determine first whether there existed probable cause to justify the seizure of the bags, and then whether there existed exigent circumstances to excuse the requirement of a search warrant.
The fact that an automobile is involved does not excuse the basic requirement that there be a full measure of probable cause in order to support a warrantless search:
 ". . . [T]hose lawfully within the country, entitled to use the public highways, have a right to free passage without interruption or search unless there is known to a competent official, authorized to search, probable cause for believing that their vehicles are carrying contraband or illegal merchandise."
Carroll v. United States, 267 U.S. 132, 45 S.Ct. 280,69 L.Ed. 543 (1925). See Paschal v. State, Ala., 365 So.2d 681
(1978); Landry v. State, 56 Ala. App. 421, 321 So.2d 759 (1975);Garsed v. State, 51 Ala. App. 622, 288 So.2d 161 (1973); Owensv. State, 51 Ala. App. 50, 282 So.2d 402, cert. denied, 291 Ala. 794, 282 So.2d 417 (1973). The concept of "probable cause" has often been explored by the courts, and in Wright v. State, Ala.Cr.App., 343 So.2d 795, cert. denied, Ala., 343 So.2d 801
(1977), the following is found:
 "`In dealing with probable cause . . . as the very name implies, we deal with probabilities. *Page 874 
These are not technical; they are the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act.' Brinegar v. United States, 338 U.S. 160, 175, 69 S.Ct. 1302, 1310, 93 L.Ed. 1879 (1949). Probable cause exists where `the facts and circumstances within their [the officers'] knowledge and of which they had reasonably trustworthy information [are] sufficient in themselves to warrant a man of reasonable caution in the belief that' an offense has been or is being committed. Carroll v. United States, [supra]. `The substance of all the definitions [of probable cause] is a reasonable ground for belief of guilt.' McCarthy v. DeArmit, 99 Pa. 63, quoted with approval in Carroll, supra . . ."
To this end, mere suspicion standing alone is never a sufficient basis for the finding of probable cause, Brinegar v.United States, 338 U.S. 160, 69 S.Ct. 1302, 93 L.Ed. 1879
(1949), and Eaton v. State, 45 Ala. App. 464, 231 So.2d 918
(1970), nor will an otherwise illegal search or seizure be made justifiable by what it turns up. Sibron v. New York,392 U.S. 40, 88 S.Ct. 1889, 20 L.Ed.2d 917 (1968), Shipman v. State,291 Ala. 484, 282 So.2d 700 (1973), and Rudolph v. State, Ala.Cr.App., 371 So.2d 962, cert. denied, Ala., 371 So.2d 965
(1979). Appellants assert that the circumstances here presented do not indicate the requisite measure of probable cause to support the belief that the duffel bags concealed the evidence or fruits of criminal activity. We disagree, and set forth below in a somewhat condensed fashion what we consider to be the relevant facts as based upon the testimony at the suppression hearing:
 1) Officers L and P, while on routine patrol on a dirt road in a rural area, unexpectedly come upon a car parked in the middle of a branch road leading directly to an abandoned, or at least seldom used, airstrip.
 2) The trunk lid of the car is up, and the officers can see two men, identified as appellants, fumbling around in the trunk. Officer L sees one of the men discard a plastic bag onto the ground beside the car, and the two officers decide to investigate.
 3) As the officers approach, one of the men, Robert Vogel, hurriedly slams the trunk lid closed as if to prevent the officers from looking into the trunk.
 4) Upon questioning, one of the men admits that they were there to dump trash despite the posted signs prohibiting this, but will not do so now since the officers are present. Robert Vogel refuses the officers' request to allow them to examine the trunk, saying first that the trunk only contains trash, and then denying that there is anything in the trunk.
 5) Three green, apparently new, duffel bags stuffed with "brick" shaped objects are visible on the back seat, as is a police scanner and walkie-talkie in the front of the car.
 6) The officers summon Investigator N and when he arrives Robert Vogel persists in his refusal to allow the opening of the trunk. He is extremely nervous and attempts to remain at all times near the trunk. At several points he physically interferes with the officers' attempts to open the trunk, escaping confinement from the police car in one instance to do so. He succeeds in breaking the keys, frustrating the officers' attempts to enter the trunk.
 7) A check of the discarded bag reveals that the Vogels have within thirty minutes purchased five new duffel bags from a nearby store. Only the three are visible.
 8) Officers L and N agree that the three duffel bags and possibly the trunk contain either stolen property or marijuana bricks, and apparently settle on marijuana because of the "brick" shaped imprints on the bags. Both are familiar with Robert Vogel's prior experiences with the law concerning stolen property and narcotics.
 9) Both officers are familiar from their training with the use of isolated airstrips in operations involving the disposal or receipt of contraband. The Vogels' car is parked some forty feet from the entrance to the field, though a cable stands between the car and field. *Page 875 
 10) Both officers are suspicious of the trash story given the new bags, in that it seems implausible that new duffel bags would be purchased for the dumping of trash.
While considered separately, any one of these occurrences might not, in itself, furnish the requisite probable cause for believing that appellants were engaging in some criminal activity and that the three duffel bags were concealing evidence of that activity, we are of the opinion that, when taken together, these events strongly indicated that appellants were involved in illegal activity. Several factors compel this conclusion. Initially, we note that, while the probable cause standard is ostensibly an objective one, we agree that "actions and things observed by an experienced law enforcement officer may have more significance to him in determining whether the law is being violated at a given time and place than they would have to a layman." United States v. McClard, 333 F. Supp. 158
(E.D.Ark. 1971); thus, "what constitutes `probable cause' . . . must be determined from the standpoint of the officer, with his skills and knowledge, rather than from the standpoint of an average citizen under similar circumstances." People v.Symmonds, 18 Ill. App.3d 587, 310 N.E.2d 208 (1974). See UnitedStates v. Ortiz, 422 U.S. 891, 95 S.Ct. 2585, 45 L.Ed.2d 623
(1975); United States v. Brignoni-Ponce, 422 U.S. 873,95 S.Ct. 2574, 45 L.Ed.2d 607 (1975); Terry v. Ohio, supra; Johnson v.United States, 333 U.S. 10, 68 S.Ct. 367, 92 L.Ed. 436 (1948);State v. Harris, 256 Wis. 93, 39 N.W.2d 912 (1949); In reJones, 264 S.C. 286, 214 S.E.2d 816 (1975). In the instant case, both Officer L and Investigator N testified that, from their training and experience, the imprints evident on the three duffel bags were of a size and shape consistent with compressed bricks of marijuana, although Officer L did at one time suspect stolen property. The officers' beliefs based upon their experiences were properly considered in determining probable cause. In this regard, this case is strikingly similar to the facts in United States v. Worthington, 544 F.2d 1275
(5th Cir.), cert. denied, 434 U.S. 817, 98 S.Ct. 55,54 L.Ed.2d 72 (1977), where "gunny sacks containing brick-like objects" were involved.
Similarly, we cannot ignore the obvious fact that appellants were engaging in their activities on a rural road a short distance from a somewhat remote airfield. Officers L and N also were familiar from their training with the use of such airstrips in operations involving contraband. We feel that such a consideration was relevant under the circumstances, and analogous with those decisions allowing examination of the "character" of the neighborhood when evaluating the actions of individuals. Cf., United States v. Davis, 561 F.2d 1014
(D.C. Cir.), cert. denied, 434 U.S. 929, 98 S.Ct. 416,54 L.Ed.2d 290 (1977) [area of high narcotics activity];Commonwealth v. Holloway, 229 Pa. Super. 128, 323 A.2d 216
(1974) ["high burglary neighborhood"]; Smith v. Swenson,328 F. Supp. 747 (W.D.Mo. 1971) [black in an all-white neighborhood]. And see, Carroll v. United States, supra.
It is recognized that "deliberately furtive actions * * * at the approach of strangers or law officers are strong indicia of mens rea," Sibron v. New York, supra, and in this regard we note the actions of appellants, notably Robert Vogel, in "hurriedly" slamming the trunk lid shut, remaining at or near the trunk, and resisting all efforts to open it, sometimes violently. While the mere fact of closing the trunk alone is capable of many innocent connotations, when seen in the light of the accompanying actions, a high degree of suspicion attaches. Cf., Daniels v. State, supra [passenger of stopped car tossed box onto back ledge at approach of police], and cases therein cited; People v. Superior Court of Yolo County,3 Cal.3d 807, 91 Cal.Rptr. 729, 478 P.2d 449 (1970) [mere gesture toward seat or floor not sufficient in itself], and cases therein cited; Annot., 45 A.L.R.3d 581 (1972).
In response to what we consider to have been reasonable questioning under the circumstances, appellants variously told the *Page 876 
officers that they were dumping trash, a story rendered somewhat implausible by the presence of recently purchased duffel bags. Robert Vogel vacillated between his assertion that there was only trash in the trunk, and that there was nothing in the trunk, all the while refusing the officers permission to examine the car. Evasive and conflicting answers to reasonable police questioning, and implausible explanations of suspicious behavior may, when considered with other factors, furnish probable cause. United States ex rel. Kirby v. Sturges,510 F.2d 397 (7th Cir.), cert. denied, 421 U.S. 1016,95 S.Ct. 2424, 44 L.Ed.2d 685 (1975); Hooks v. State of Oklahoma,394 F. Supp. 1262 (W.D.Okla. 1975); State v. Lee, 302 Minn. 382,225 N.W.2d 14 (1974); State v. Cavazos, 18 Or. App. 197,524 P.2d 546 (1974).
Finally, both officers were familiar with Robert Vogel's prior criminal experiences involving stolen property and narcotics, certainly highly relevant in this instance. Robinsonv. State, Ala.Cr.App., 361 So.2d 379, cert. denied, Ala.,361 So.2d 383 (1978); Hatton v. State, Ala.Cr.App., 359 So.2d 822,writ quashed, Ala., 359 So.2d 832 (1977).
We hold that the circumstances and factors examined above establish that ample probable cause existed to justify the officers in believing that appellants were concealing contraband in the plainly visible duffel bags. In Shipman v.State, 291 Ala. 484, 282 So.2d 700 (1973), our Supreme Court held that for an item in plain view to be validly seized "the officer must possess some judgment at the time that the object to be seized is contraband and that judgment must be based upon probable cause." Because we find that here the officers did have such probable cause, we distinguish the decisions of the Supreme Court in Shipman and in Kinard v. State, Ala.,335 So.2d 927 (1976), wherein seizures of "white powder" and "pink pills" were invalidated because the officers possessed no knowledge that the items were contraband. We have examined the cases cited to us by appellants on the issue of probable cause, and determine that the statement "two cases are seldom sufficiently alike for the first to be an absolute binding precedent for the second," Arrington v. United States,311 A.2d 838 (D.C.App. 1973), is particularly appropriate.
The second determination to be made is whether exigent circumstances existed to justify executing the seizure then and there, or in the absence thereof, whether a warrant should have been obtained first. Although "[T]he word `automobile' is not a talisman in whose presence the Fourth Amendment fades away and disappears," Coolidge v. New Hampshire, supra, it is apparent that automobiles and other "movables" have long been afforded somewhat different treatment in the context of the Fourth Amendment:
 ". . . [T]he guaranty of freedom from unreasonable searches and seizures by the Fourth Amendment has been construed, practically since the beginning of the government, as recognizing a necessary difference between a search of a store, dwelling house, or other structure in respect of which a proper official warrant readily may be obtained and a search of a ship, motor boat, wagon or automobile for contraband goods, where it is not practicable to secure a warrant, because the vehicle can be quickly moved out of the locality or jurisdiction in which the warrant must be sought."
Here, however, appellants assert that, since both of them were under arrest [which is cast in doubt by the record], and there were plenty of police officers around to see that the car was guarded, no exigencies in respect to mobility existed, and thus there was no plausible excuse for the failure to secure a warrant. Our Supreme Court recently rejected such an argument in the decision of Ex parte State [Re: Reid v. State], Ala.,388 So.2d 208 [1980], relying on Chambers v. Maroney,399 U.S. 42, 90 S.Ct. 1975, 26 L.Ed.2d 419 (1970), wherein it was stated:
 "For constitutional purposes, we see no difference between on the one hand seizing and holding a car before presenting the probable cause to a magistrate and on *Page 877 
the other hand carrying out an immediate search without a warrant. Given probable cause to search, either course is reasonable under the Fourth Amendment."
We find this language applicable here, and additionally note that, though Robert Vogel was under arrest for littering, Gerald Vogel had not been arrested at the time of the seizure [though he was handcuffed at one point to prevent him from aiding Robert in his affray with the officers] and was, at least theoretically, free to leave. Cf., Daniels v. State, supra. It is thus clear that given the probable cause to believe that the bags contained contraband, the officers were entitled to enter the vehicle and seize the bags.
Appellants further argue, however, that the opening of the duffel bags at the scene was improper in that no exceptions to the warrant requirement purport to allow "the right to search luggage (such as duffel bags) therein or the closed and locked trunk of the vehicle." Appellants only cite State v. Patino,163 N.J. Super. 116, 394 A.2d 365 (1978), for support in this rather broad statement, but we find that, while Patino can be read for the proposition that probable cause to search the interior of a car does not necessarily extend to other areas, such as the trunk, the situation here did not involve a warrantless search of the trunk (a warrant was later obtained and the trunk opened at the police station). Our only concern is thus whether the officers were justified in opening the bags on the spot instead of returning them to the police station to await a warrant. (Cf., Bassett v. State, 49 Ala. App. 733,275 So.2d 713 (1972), reversed, 290 Ala. 259, 275 So.2d 720
(1973)).
The United States Supreme Court has recognized that, because they are "intended as a repository of personal effects," items of personal luggage enjoy the full protection of the Fourth Amendment, apparently whether they are seized from automobiles or not. In United States v. Chadwick, 433 U.S. 1,97 S.Ct. 2476, 53 L.Ed.2d 538 (1977), federal agents who had the greatest measure of probable cause that a footlocker contained marijuana seized the locker without a warrant as it was being loaded into a parked car. The Court held that the subsequent warrantless search of the locker at the scene was unconstitutional, as no exigency obtained since the locker was under the agents' exclusive control and was not in any danger of being spirited off by the defendants. The government, however, did not attempt to invoke the "automobile exception."
Subsequently, in Arkansas v. Sanders, 442 U.S. 753,99 S.Ct. 2586, 61 L.Ed.2d 235 (1979), officers had probable cause to stop a vehicle and seize a suitcase from the car's trunk; they then opened the unlocked suitcase at the scene and found contraband. The Court, in negating this action and refusing to extend "Carroll and its progeny to the warrantless search of one's personal luggage merely because it was located in an automobile lawfully stopped by the police" (Emphasis added), held that the mere exigency of mobility attendant to automobiles would not be sufficient in itself to justify the search at the scene of personal luggage where the officers had control of the items and could secure a warrant at some later time. But, as the Court explained in a footnote, the Sanders
decision is quite limited:
 "Not all containers and packages found by police during the course of a search will deserve the full protection of the Fourth Amendment. Thus, some containers (for example a kit of burglar tools or a gun case) by their very nature cannot support any reasonable expectation of privacy because their contents can be inferred from their outward appearance. Similarly, in some cases the contents of a package will be open to `plain view,' thereby obviating the need for a warrant . . . Our decision in this case means only that a warrant generally is required before personal luggage can be searched. . . ."
Our examination of the facts convinces us that the duffel bags in appellants' car were not a "repository of personal effects" within the ambit of Sanders, given that they had been purchased only a short time before, *Page 878 
and were quite obviously stuffed with "brick" shaped objects, giving the indication of anything but personal effects. We hold that it was proper for the officers to search the bags immediately rather than waiting for a warrant. Cf., UnitedStates v. Neumann, 585 F.2d 355 (8th Cir. 1978) [department store box]; United States v. Gaultney, 581 F.2d 1137 (5th Cir. 1978) ["scrabble box taped shut]; State v. Heberly, 120 Ariz. 541,587 P.2d 260 (1978) [ice chest]; Wyss v. State,262 Ark. 502, 558 S.W.2d 141 (1977) [tool box]; Cooper v. Commonwealth,577 S.W.2d 34 (Ky.App. 1979) [electric razor box taped shut];State v. Guzman, 362 So.2d 744 (La. 1978), cert. denied,443 U.S. 912, 99 S.Ct. 3103, 61 L.Ed.2d 876 (1979) [paper bag];State v. Johnson, 277 N.W.2d 346 (Minn. 1979) [paper bag].
This is not to say that a duffel bag could never be such a personal item deserving of the protection mandated by Sanders, but under these particular circumstances it was evident that appellants by their actions did not intend to elevate the status of this item to that of a suitcase or other such personal luggage.
We have carefully reviewed the record and the arguments submitted on this issue and conclude that, based upon the above reasoning and authorities, the trial court correctly overruled appellants' motion to suppress the evidence of the drugs seized both from the back seat and trunk of their car. In deciding as we have that the seizure of the duffel bags was made with probable cause and exigent circumstances, we do not reach appellants' further contentions that the seizure was not incident to arrest or the product of a legitimate inventory.
 II
At the close of the evidence, the trial court adjudged the appellants to be guilty as charged with respect to eleven of the fourteen counts of their respective indictments, and sentenced each of them to eleven separate terms of imprisonment, some to be served consecutively and some concurrently. Appellants contend that such a sentencing scheme is contrary to the language and intent of the penalty provision of the Controlled Substances Act at § 20-2-70 (a), Code of Alabama 1975, in that it regards the simultaneous possession of the eleven different types of drugs as, in effect, eleven possessions. The relevant Code section under which appellants were charged and convicted, § 20-2-70 (a), is a provision of the Controlled Substances Act that prohibits, among other things, the possession of controlled substances, and sets forth the penalty to be exacted:
"§ 20-2-70. Prohibited acts A.
 "(a) Except as authorized by this chapter, any person who possesses, sells, furnishes, gives away, obtains or attempts to obtain by fraud, deceit, misrepresentation or subterfuge or by the forgery or alteration of a prescription or written order or by the concealment of material fact or by use of false name or giving a false address controlled substances enumerated in schedules I, II, III, IV, and V is guilty of a felony and, upon conviction, may be imprisoned for not less than two nor more than 15 years and, in addition, may be fined not more than $25,000. . . ."
Appellants argue that the language of this section does not permit a separate charge and sentence for possession to be predicated on each different type of drug seized where, as here, the fact of possession of the various drugs occurred at the same time and in the same place. The State, on the other hand, contends that such a practice is authorized because the drugs are listed on separate schedules and "the element of proof is different for each substance." The issue which results is whether the eleven types of drugs found in the five duffel bags and admittedly under the control of the appellants constituted a single offense of possession under § 20-2-70 (a), thereby requiring only a single sentence, or eleven separate possessions, which would justify the action of the trial court in imposing eleven separate sentences.
This particular question as to the construction of § 20-2-70
(a) is one of first impression in Alabama, but we find that *Page 879 
our cases have treated the underlying principles here present in other contexts. It is thus apparent that Alabama cases have long recognized that constitutional double jeopardy provisions, U.S. Const. Amend. V and Ala. Const., Art. I, § 9, prohibit the splitting of a single criminal act so as to justify multiple prosecutions for the identical criminal behavior. In Kilpatrickv. State, 257 Ala. 316, 59 So.2d 61 (1952), in the context of a multiple murder prosecution, our Supreme Court stated:
 "Sometimes as a part of a single transaction more than one offense is charged to have been committed. If a person does a single act which results in the injury or death of more than one person, only one offense can be fastened upon him. But if in that occurrence he shoots different persons by different discharges of his firearm, an offense can be fastened separately as to each person so injured or killed, although there was but one transaction, and upon a trial for such offense the whole transaction is admissible. Smith v. State, 88 Ala. 73, 76, 7 So. 52; Cheek v. State, 38 Ala. 227; Gunter v. State, 111 Ala. 23, 20 So. 632; Grissett v. State, 241 Ala. 343, 2 So.2d 399."
This is merely a crystallization of the familiar principle that, where an "indictment contains . . . counts charging offenses calling for the same punishment, and relates to a single criminal transaction, only one penalty can be imposed."Jackson v. State, 249 Ala. 348, 31 So.2d 519 (1947), and cases therein cited. Thus, in Wilkerson v. State, 41 Ala. App. 265,130 So.2d 348, cert. denied, 272 Ala. 712, 130 So.2d 350
(1961), the defendant had been charged in a single indictment with assault with the intent to either murder or ravish a particular woman, with assault with the intent to ravish the woman in the second count, and with the assault with intent to murder her in the third count. The Court of Appeals, in reversing defendant's convictions on two of the counts, said:
 "The defendant was charged under Section 38, Title 14, Code 1940, which reads in pertinent part:
 "`Any person who commits an assault on another, with intent to murder, maim, rob, ravish, or commit the crime against nature, * * * shall, on conviction, be punished, * * *.'
 "It is evident both from the indictment and the evidence that the several counts are different ways of charging the same offense, joined for the purpose of meeting the different aspects in which the evidence might present a single transaction."
Cf., Murry v. State, 48 Ala. App. 89, 261 So.2d 922 (1972);Windham v. State, 41 Ala. App. 280, 129 So.2d 338 (1961); Lynnv. State, 31 Ala. App. 216, 14 So.2d 259 (1943); Crosswhite v.State, 31 Ala. App. 181, 13 So.2d 693 (1943); Landers v. State,26 Ala. App. 506, 162 So. 550 (1935). In Green v. State,22 Ala. App. 536, 117 So. 607 (1928), the defendant was tried on several occasions for possession of liquor on the basis of several containers of whisky which had been seized at one time from defendant's premises; the Court of Appeals held this impermissible:
 "We do not hold that a person cannot be guilty of two or more possessions of whisky at one and the same time. But we do hold that where the premises are the same and the time is the same, the possession of all the whisky on the premises of which the owner has a guilty knowledge, and of which he has control, is one possession and may not be split up into numerous offenses. In the case of Holland v. State, 21 Ala. App. 520, 109 So. 885, which decision was approved in Holland v. State, 215 Ala. 106, 109 So. 886, this court said:
 "`If there was whisky in the smoke house, some just below the house under a log, and a quart lying in the water under a tree, and all of this was in the defendant's possession at the same time, there was only one possession.'"
Similarly, in the case of Whitaker v. State, 21 Ala. App. 114,105 So. 433 (1925), the fact of possession was discussed in the context of liquor offenses: *Page 880 
 "Under the state's evidence, the first whisky found was in defendant's iron safe in his store, and afterwards during the same search there was found 15 gallons in defendant's barn nearby. There was objection to the testimony as to the 15 gallons, upon the theory that the same constituted a separate and distinct offense. We do not agree with this contention. Whether the whisky was in one place or a dozen places, if the possession was in the defendant and at the same time, the defendant could only be prosecuted for one offense. The defendant is not prosecuted on a charge of possessing any particular amount or brand of whisky, but the offense is complete when it is proven that he possessed prohibited liquor, and such prosecution covers all the whisky he possessed at that time."
And, although Alabama has not confronted this issue with respect to an instance where, such as here, a single search or seizure at one point in time reveals several different controlled substances, we note that other cases from other jurisdictions have adopted similar lines of reasoning in construing their possession statutes. In Braden v. UnitedStates, 270 F. 441 (8th Cir. 1920), the Eighth Circuit, in assessing the older Federal possession statute, held that simultaneous possession of several different drugs would not support multiple convictions or sentences:
 "Counsel for the United States contend that the words `any of the aforesaid drugs,' as used in section 8, permit him to base a count upon each drug found in the possession of the defendant although the drugs were all found at the same time and place. We do not think that any such significance can be given to the word `any.' The use of this word simply means that, if the defendant under the required circumstances should be found in possession of any of said drugs, he would be guilty. If a person steals four horses from the barn of another, all being of different color, it would not be competent to charge the thief with four different larcenies when the horses were all taken at the same time and place. Another illustration would be the larceny of articles of merchandise from a store. If twelve articles were all taken at the same time and place, we do not think it would be competent to charge the thief with twelve different larcenies."
This reasoning was also adopted in State v. Butler,112 N.J. Super. 305, 271 A.2d 17 (1970), where that court held that "a single act of possession, which occurred at one time and in one place, cannot be the basis for multiple offenses." See also, People v. Manning, 71 Ill.2d 132, 15 Ill.Dec. 765,374 N.E.2d 200 (1978); State v. Homer, 22 Or. App. 328, 538 P.2d 945
(1975).
It is apparently the State's argument, however, that because appellants were in possession of controlled substances listed on several separate schedules, thus "demonstrating different chemical makeups among the prohibited substances," the "element of proof" for each substance was necessarily different and each drug's possession should have been a separate offense. We have found that a number of cases from other jurisdictions have indeed reasoned that the necessity of a different showing of proof for each separate drug would support treating different drugs in separate counts of an indictment, and justify separate sentences. For example, in Melby v. State, 70 Wis.2d 368,234 N.W.2d 634 (1975), the Wisconsin Supreme Court observed:
 ". . . [I]n the instant case, each substance is different and the illegality of each must be determined independently, without regard to the others. The two drugs involved are listed as separate prohibited substances under the definition of dangerous drugs. Had one type been analyzed and found to be of a lawful variety, that would not have made possession of the others lawful. Proof was necessary that each drug was of a type prohibited by the statute. The three different prohibited substances give rise to three separate criminal charges, and defendant was *Page 881 
not charged with the same crime three times."
A similar argument was likewise sustained in State v. Gordon,536 S.W.2d 811 (Mo.App. 1976), where the court accepted the reasoning even where "the only fact which the State would have to establish in Count II which would be any different than the facts to be established in Count III is the nature of the controlled substance." In State v. Adams, 364 A.2d 1237
(Del.Super.Ct. 1976), it was stated:
 "Here, each count charges possession of a separate controlled substance. Proof of the identity of the item possessed is an element of the offense as contemplated by 11 Del.C. § 232. A prima facie case is made when some credible evidence tending to prove the existence of each element of the offense has been established. 11 Del.C. § 301. It is generally accepted that in charging a drug violation, the indictment must specify the drug involved. In a charge of possession with intent to deliver a particular drug, the evidence must show that defendant possessed a substance, the substance was the drug charged, and that in connection with the possession thereof defendant intended to sell it. Where possession of separate drugs is charged, while the evidence relating to possession may be the same for each charge, the evidence describing the substance and establishing its drug identity . . . would undoubtedly differ with respect to each drug charged. Hence, the totality of evidence required to prove one count would not establish all of the elements required with respect to the other counts."
See also, State v. Collier, 567 S.W.2d 165 (Tenn. 1978);People v. Innes, 16 Cal.App.3d 175, 93 Cal.Rptr. 829 (1971).
We are not persuaded by the so-called "identical evidence test" enunciated in the above-cited cases and apparently adopted by the State here in its argument because we do not read § 20-2-70 (a) as requiring that such a test be applied. It is apparent that this section, while listing several distinct offenses which might be committed, such as possession, sale and the like, only applies to "controlled substances enumerated in schedules I, II, III, IV and V" and further makes no differentiation between penalties for offenses involving substances in schedule I and, for instance, schedules IV or V. Our version of the Controlled Substances Act was drafted in 1971 to "standardize all laws in this state to be in conformity with the new Federal Comprehensive Drug Abuse Prevention and Control Act of 1970 [21 U.S.C. § 801, et seq.]," see preface to Acts 1971, No. 1407, at p. 2378, and, for the most part tracks quite closely the Federal act and the Uniform Controlled Substances Act promulgated by the National Conference of Commissioners on Uniform State Laws. Thus, our act does contain the five separate schedules designed to classify drugs according to their "abuse potential, and psychological and physical effects," (1970) U.S. Code Cong. Ad. News, p. 4566, and the criteria applicable to each. See §§ 20-2-22-23 [Schedule I]; §§ 20-2-24-25 [Schedule II]; §§ 20-2-26-27 [Schedule III]; §§ 20-2-28-29 [Schedule IV]; §§ 20-2-30-31 [Schedule V]. The major deviation, however, between our version of the statute and that provided by the Federal, Uniform and many state acts is that our act does not impose different penalties based upon the schedules of the involved drugs as opposed to Schedule V drugs [Schedule V representing, on a relative basis, the least harmful drugs]. As noted in the comment to § 401 of the Uniform Act:
 "The penalty structure is broken down according to the schedule of the substance involved and the particular unlawful act, since it is felt that trafficking offenses involving certain types of drugs constitute a greater danger to the public and are deserving of stiffer penalties."
Our reading of § 20-2-70 (a) does not disclose any such emphasis on the various schedules as a factor in the sentencing *Page 882 
scheme, but instead only indicates that the statute prohibits the "possess[ion] . . . of controlled substances enumerated in schedules I, II, III, IV and V" and makes such possession "of controlled substances" to be "a felony" with only one scheme of punishment [two to fifteen years, and a possible fine]. The focal point of the statute is thus the criminal act itself, whether it be possession, sale or any of the other offenses, and not in what schedules the drug or drugs are located. As our present statute reads, the only relevance of the schedules is to act as a definitional scheme for indicating what are "controlled substances," the possession of which is prohibited by the statute; this is further bolstered by the definition of a "controlled substance" as a "drug, substance or immediate precursor in schedules I through V of article 2 of this chapter." § 20-2-2 (5), Code of Alabama 1975. Clearly, the language of the statute indicates that the possession of such substances renders a defendant "guilty of a felony" and not guilty of several felonies based upon how many drugs are simultaneously within the control of the defendant, or in which schedules they are listed. Once the presence of the first controlled substance is proven, the offense is complete, and the presence of other controlled substances at the same time does not act to split the possession. By applying theprinciples developed in our case law to the plain language of §20-2-70 (a), we thus find that the possession is the criminal offense, and our section does not sanction basing multiple prosecutions or sentences on the mere fact that several types of drugs were so possessed at one point in time. If the legislature had intended to allow such multiple prosecutions it would have certainly framed this section in language clearly manifesting such intent.
It is thus our holding that where, as here, there is but a single point of control in time and place over several types of controlled substances, only a single offense has been committed, the offense of possession of controlled substances, and only one sentence is authorized. Pursuant to this reasoning, we find that, on these facts, the trial court erred in imposing multiple sentences on appellants. At the same time, however, we are convinced from the evidence of appellants' overwhelming guilt in this matter, and we therefore affirm both of these convictions. Both causes, however, are remanded to the trial court solely for the imposition of single sentences within the limits mandated by § 20-2-70 (a).
AFFIRMED IN PART; REVERSED AND REMANDED IN PART, AND REMANDED FOR PROPER SENTENCES.
HARRIS, P.J., concurs.
DeCARLO, J., concurs in Part I, but dissents as to Part II.
BOOKOUT and BOWEN, JJ., concur in the result of Part I, but both concur in Part II.
[1] Cf., United States v. Mendenhall, 446 U.S. 544,100 S.Ct. 1870, 64 L.Ed.2d 497 (1980), where, while resting its decision on principles of consent, the Supreme Court appears to have recognized investigatory stops of persons displaying conduct "which appeared to the agents to be characteristic of persons unlawfully carrying narcotics."