The State of Alabama petitioned this Court for a writ of certiorari to review the judgment of the Court of Criminal Appeals reversing Dewey Donald Featherston's conviction for two counts of criminal possession of a forged instrument in the second degree. We granted the State's petition to consider whether the Court of Criminal Appeals incorrectly decided an issue of first impression and whether its opinion conflicted with prior cases of that court on the same point of law. After considering the State's arguments, we reverse and remand.
The Court of Criminal Appeals set out the pertinent facts of this appeal as follows:
 "The appellant, Dewey Donald Featherston, was convicted of two counts of criminal possession of a forged instrument in the second degree, a violation of § 13A-9-6, Ala. Code 1975. Featherston was sentenced to concurrent terms of four years' imprisonment; however, the sentences were suspended and he was placed on four years' supervised probation and was ordered to pay restitution.
 "The evidence elicited at trial tended to establish the following: The victim, William Campbell (`Mr. Campbell'), was an elderly man who lived alone. Mr. Campbell was a diabetic; his diabetes affected his legs and his vision. Although Mr. Campbell's eyesight `wasn't real good,' his mind was sharp.
 "Mr. Campbell was independent and insisted on living alone. He cared for himself, retrieved his daily mail, and maintained a checking account at AmSouth Bank to cover his regular expenses. His son, William P. Campbell (`William'), ensured that Mr. Campbell's basic needs were met. William checked on his father daily; he made sure that *Page 219 
his father ate regularly, that he took his medicines, that he kept his regularly scheduled doctors' appointments, and that he paid his bills. Because Mr. Campbell's vision was poor, William assisted his father in paying his monthly bills. Once or twice a month, William would sit down with his father and review the bills that had arrived in the mail. William would make out the appropriate check, and his father would then sign the check. No one other than William ever assisted his father in writing checks.
 "Late in 1996, William experienced some health problems that required surgery. Because William would be hospitalized for several days, he needed someone to assist him in caring for his father. Around this time, William's daughter, Lisa, arrived at her father's home. Lisa was accompanied by Jimmy Featherston, whom she identified as her husband. Lisa and Jimmy had nowhere to stay, so William asked his daughter if she and Jimmy would stay with Mr. Campbell and see to his needs until William was out of the hospital. Because Lisa rarely came home for more than a week or two at a time, William believed that having the couple stay with Mr. Campbell would benefit everyone.
 "Upon William's release from the hospital, he was able to resume his care of Mr. Campbell. However, Lisa and Jimmy showed no signs of leaving. William learned that while Lisa and Jimmy were staying with Mr. Campbell, he had bought them groceries and lent them money and let them use a truck. William suggested that the couple should find a place of their own so that they and Mr. Campbell could have some privacy. In February 1997, Lisa and Jimmy left the area suddenly. William learned that they were gone when Mr. Campbell telephoned him and asked him to do some shopping for him because the couple had left.
 "Lisa and Jimmy's abrupt departure from the area made William suspicious. When Mr. Campbell mentioned to William that he seemed to have lost or misplaced a book of checks, he became even more suspicious, and he suspected that money might be missing from his father's checking account. William knew that as of October 1996, the date of the most recent bank statement he had reviewed for his father, Mr. Campbell had approximately $45,000 in the checking account. However, on February 26, 1997, when William took Mr. Campbell to one of the Decatur branches of AmSouth Bank to cash a check and to inquire about his account, a bank teller informed Mr. Campbell that his account balance was approximately $135. William immediately transferred money from another account into his father's checking account so that he would have funds to pay his bills.
 "William knew that it was not possible for his father to have spent that amount of money on his day-to-day expenses in such a short period. William told bank personnel that he suspected someone of forging Mr. Campbell's signature on a book of missing checks, and he requested copies of all checks that had been written for an amount in excess of $100. Bank officials told William that he and his father needed to file a report with the police; they did so. After they filed the police report with Investigator Mike Pettey of the Decatur Police Department, William and Mr. Campbell returned to AmSouth [Bank], where William assisted his father in completing a number of affidavits alleging that a forgery had occurred in his account. Mr. Campbell executed 25 forgery affidavits. The amounts of the forged checks *Page 220 
ranged from $100 to $1,800. A total of $36,455 had been taken from Mr. Campbell's account without his knowledge.
 "The customer service department of AmSouth Bank contacted Mike Smith, an investigator with AmSouth's corporate security department, on February 26, 1997. He began an investigation into the forged checks. He discovered that 17 of the 25 forged checks had been written to the order of Donny Featherston, Jimmy Featherston's brother. Smith learned that the checks had been cashed at branches of AmSouth Bank in Morgan County and nearby counties. He was able to obtain videotapes from two AmSouth banks in Morgan County on days that the forged checks were cashed, and he saw [Dewey Donald (`Donny')] Featherston cashing the checks. Donny Featherston cashed check number 3072 for $1,200 on January 2, 1997, and check number 3117 for $1,500 on February 3, 1997. Both checks were noted as being for `home repairs.' However, no repairs had been performed on Mr. Campbell's residence. Only two of the 25 forged checks were cashed in Morgan County.
 "While Mike Smith was performing an internal bank investigation into the forged checks, Investigator Mike Pettey was conducting a criminal investigation into the matter. He obtained a list of the forged checks and the payees, and began attempting to locate the various payees. Given that 17 of the 25 forged checks were made out to Donny Featherston, Pettey was particularly interested in Featherston. He ran a driver's license check and a criminal history check on Donny Featherston. Investigator Pettey learned that Donny Featherston had once been arrested by the Huntsville Police Department. As a result of that arrest, Pettey was able to obtain a photograph of Donny Featherston, which he compared to the person shown cashing the checks on videotape, thus confirming that Donny Featherston was, in fact, the person who had cashed forged checks numbered 3072 and 3117.
 "In July 1997, approximately five months after he executed the forgery affidavits, Mr. Campbell died. The investigation, however, continued.
 "On September 25, 1997, Donny Featherston was arrested in Huntsville. He was charged with two counts of possession of a forged instrument in the second degree. Following [Featherston's] arrest, Investigator Pettey went to Huntsville and interviewed Featherston. Featherston gave Pettey a statement detailing his actions with regard to the two forged checks he had cashed in Morgan County. Featherston admitted cashing the two checks. The statement continued:
 "`I did not know Mr. William Campbell personally and was owed no money by Mr. Campbell for any reason. I came in possession of these two checks through my brother Jimmy Featherston and Lisa Campbell. Lisa Campbell was to be [sic] the granddaughter of William Campbell. I was somewhat questionable of Jimmy and Lisa when they came to me with the checks because I was aware of Jimmy's past history and wouldn't put it past Jimmy to have stolen the checks. Jimmy did, however, tell me that he had been doing work for Mr. Campbell and that he had received the checks from William Campbell's secretary. I had since learned that the checks were to have been stolen by Jimmy and Lisa. I cashed the listed checks as well as several others on the William Campbell account as asked by Jimmy and Lisa. I would get $100.00 from Jimmy and Lisa for each of the *Page 221 
checks I cashed. Each check on the Campbell account that I cashed [was] made payable to Donny Featherston and the majority of the checks that I did cash were cashed in the City of Decatur. There were other checks that I cashed for Jimmy and Lisa and they were cashed in the City of Madison and Huntsville. The way that I would usually get up with Jimmy and Lisa was for them to page me and I would call them back. Jimmy would say that he had a check he needed to cash and I would come to Decatur and pick him and sometimes Lisa [up] and we would go to the bank. Jimmy would sometimes make out the checks as we sat in the car. Sometimes the checks would already be made out.'
 "At trial, the State offered the testimony of several witnesses, including Mr. Campbell's son, William, who testified that he was able to recognize his father's signature and that the signature on checks 3072 and 3117 was not his father's. The State also offered State's Exhibits 7 and 8, the forgery affidavits executed by Mr. Campbell on February 26, 1997. Over Featherston's objection, the trial court determined that the affidavits were admissible under the business records exception to the hearsay rule. The jury convicted Featherston of two counts of possession of a forged instrument in the second degree. This appeal followed."
Featherston v. State, 849 So.2d 209, 210-12 (Ala.Crim.App. 2001).
The State argues (1) that the Court of Criminal Appeals wrongly decided an issue of first impression — that issue being "whether the trial court erred when it admitted State's Exhibits 7 and 8, the forgery affidavits executed by Mr. Campbell on February 26, 1997, under the business records exception to the hearsay rule," 849 So.2d at 212; and (2) that the Court of Criminal Appeals' opinion is in conflict with previous opinions of that court standing for the proposition that the erroneous admission of evidence that is merely cumulative is harmless error. The Court of Criminal Appeals determined that the trial court had erroneously allowed Mr. Campbell's affidavits alleging that a forgery had occurred in his account to be admitted under the business-records exception to the hearsay rule, and it declined to apply the harmless-error rule.[1]
In regard to the admissibility of the forgery affidavits, the Court of Criminal Appeals concluded that the issue was one of first impression, and it looked to other jurisdictions for guidance. The court concluded that where the individual reporting the information included in a business record is not an employee of the business, the statement is hearsay and is not admissible as part of the business record. We do not address this issue because we conclude that the harmless-error rule is applicable; thus, any error that might *Page 222 
have occurred in the admission of the affidavits does not constitute reversible error.
The State argues that the forgery affidavits were merely cumulative to other properly admitted evidence and that any error, therefore, was harmless, even if their admission was erroneous. The State cites Dawsonv. State, 675 So.2d 897, 900 (Ala.Crim.App. 1995), for the proposition that "[t]he erroneous admission of evidence that is merely cumulative is harmless error"; and cites Yeomans v. State, 641 So.2d 1269, 1272
(Ala.Crim.App. 1993), for the proposition that "[t]estimony that may be apparently inadmissible may be rendered innocuous by subsequent or prior lawful testimony to the same effect or from which the same facts can be inferred." Rule 45, Ala.R.App.P., the harmless-error rule, states:
 "No judgment may be reversed or set aside, nor new trial granted in any . . . criminal case on the ground of . . . the improper admission . . . of evidence, . . . unless in the opinion of the court to which the appeal is taken . . ., after an examination of the entire case, it should appear that the error complained of has probably injuriously affected substantial rights of the parties."
Further, in assessing harmless error, the factors to be considered include "`"the importance of the [declarant's] testimony in the prosecution's case, whether the testimony was cumulative, the presence or absence of evidence corroborating or contradicting the testimony of the [declarant] on material points, . . . and the overall strength of the prosecution's case."'" Baker v. State, [Ms. CR-95-0292, January 12, 2001] ___ So.2d ___, ___ (Ala.Crim.App. 2001) (quoting James v. State,723 So.2d 776, 782 (Ala.Crim.App. 1998) (in turn quoting Delaware v. VanArsdall, 475 U.S. 673, 684 (1986))).
In declining to apply the harmless-error rule, the Court of Criminal Appeals stated:
 "Moreover, we cannot say that the trial court's error was harmless. Mr. Campbell's son testified that he recognized his father's signature and that the signature on the checks was definitely not his father's signature. This testimony constituted the State's proof that the checks were forged. However, with the erroneous admission of the affidavit, the jury was given its only opportunity to examine the actual signature of the victim of the forgery, William Campbell, and to compare that signature with the signature on the forged checks. Thus, the admission of the affidavit strengthened the State's case. Under these circumstances, we are unable to say that admission of the affidavits did not injuriously affect the substantial rights of Featherston. Rule 45, Ala.R.App.P. See also Johnson v. State, 633 So.2d [484] at 485 [(Fla.Dist.Ct.App. 1994)]; Ground v. State, 702 N.E.2d [728] at 732 [(Ind.Ct.App. 1998)]."
849 So.2d at 216-17 (emphasis added).
The record shows that the State did not offer the forgery affidavits into evidence until the end of its case-in-chief, after Featherston, in his cross-examination of William Campbell, had offered into evidence, and obtained the admission of, a similar forgery affidavit signed by the victim, Mr. Campbell. The reporter's transcript states, in pertinent part:
 "Q. [Defense counsel:] . . . I'll show you what I have marked as Defendant's Exhibit Number 2. Is that a copy of the affidavit that your father filled out?
"A. [William Campbell:] Looks like it. It seems to be.
 "Q. Okay. Would you be in agreement that this is your father's signature down there at the bottom of this? *Page 223 
"A. Uh-huh. (Affirmative) That's his.
 "Q. You're saying that this signature and that signature [on Defendant's Exhibit Number 1, a check alleged to have been forged] are by two different people?
 "A. Uh-huh. (Affirmative) That's not it. He didn't sign that check.
 "Q. Now, you're not a handwriting expert or anything, are you?
"A. No.
"Q. Okay.
 "[Defendant's counsel]: We would offer Defendant's Exhibit Number 2, as well, Your Honor.
"THE COURT: It's admitted."
We thus conclude that the Court of Criminal Appeals erred in stating that the forgery affidavits submitted into evidence by the State gave the jury "its only opportunity to examine the actual signature of the victim of the forgery, [Mr.] Campbell, and to compare that signature with the signature on the forged checks." As noted by the transcribed testimony set out above, Featherston himself submitted into evidence a check and a forgery affidavit, which the jury had before it for signature comparison purposes. Moreover, because this evidence had already been submitted into evidence by Featherston, the State's subsequent submission of the two forgery affidavits was "merely cumulative" insofar as it presented the jury with an authenticated signature of the victim, for comparison purposes, and the fact that it "strengthened" the State's case is not fatal. See Dawson and Baker. We further agree with Judge Shaw's statement in his dissent (see note 1 to this opinion) that the forgery affidavits were cumulative because there was "other evidence that strongly indicated the appellant's guilt, including the testimony of the victim's son, William Campbell; the testimony of Investigators Mike Smith and Mike Pettey; the appellant's statement; and the videotape of the appellant's cashing the forged checks." 849 So.2d at 217.
Therefore, the judgment of the Court of Criminal Appeals is reversed and this cause is remanded for that court to proceed in a manner consistent with this opinion.
REVERSED AND REMANDED.*
Moore, C.J., and Houston, See, Lyons, Brown, Woodall, and Stuart, JJ., concur.
[1] Judge Shaw issued a dissenting opinion. That opinion stated, in pertinent part:
 "Notwithstanding the apparent error in admitting the forgery affidavits into evidence, I cannot hold, `after an examination of the entire cause,' that that error `probably injuriously affected [the appellant's] substantial rights.' I agree with the State that the forgery affidavits were merely cumulative of other evidence that strongly indicated the appellant's guilt, including the testimony of the victim's son, William Campbell; the testimony of Investigators Mike Smith and Mike Pettey; the appellant's statement; and the videotape of the appellant's cashing the forged checks. I do not believe that the findings of the jury in this case turned on the admission of the forgery affidavits."
849 So.2d at 217 (Shaw, J., dissenting).
* Note from the reporter of decisions: On October 18, 2002, on remand from the Supreme Court, the Court of Criminal Appeals affirmed, without opinion.