WELCH, Judge,
dissenting.
The majority, in its unpublished memorandum, affirms R.E.R.’s conviction for first-degree rape.[1] R.E.R. contends on appeal that the trial court committed reversible error when the court allowed prejudicial hearsay to be presented to the jury. The majority held that the trial court’s ruling admitting the hearsay was not reversible error because the evidence was cumulative to other similar evidence, and, thus, its admission was harmless error. I disagree with the conclusion that this error was harmless; therefore, I respectfully dissent.
The rape alleged in this case occurred approximately 25 years ago in Cullman. M.D.,[2] the victim, reported that R.E.R. sexually assaulted her over a number of years beginning when she was a young child and ending when she was 14 years old. She reported R.E.R.’s conduct in May 2009 after her husband encouraged her to do so. M.D. was 34 years old at the time of R.E.R.’s trial.
When M.D. was approximately two or three years old, R.E.R. became her stepfather. R.E.R. was in the Army and was deployed to Germany when M.D. was six or seven years old. At that time, R.E.R., her mother, her older brother, and her two younger sisters moved to Germany. M.D. testified that R.E.R. raped her the first time when her family lived in Germany. She guessed that she was in the second grade at the time. She stated that he sexually assaulted her so often that “they all kind of run together.” (R. 88.) M.D. remembered that R.E.R. made up a game called “hide and go get it.” (R. 88.) She said the rules of this game were that she and her mother “would have to hide from him, and whoever he found, he has sex with.” (R. 88.) M.D. testified that, as part of the game, R.E.R. made her brother, D.R., have sex with her, and R.E.R. made her brother have sex with then-mother, K.R., in M.D.’s presence. M.D. testified that on other occasions R.E.R. would “pull [her] into the bedroom with him and [her] mother” and her mother *1197 would hold M.D. down while R.E.R. had sex with her. (R. 89.) M.D. testified that R.E.R. instructed them never to talk about the sexual conduct or they would be in trouble. She testified that R.E.R.’s spankings consisted of hitting her with a belt from her feet to her neck and that she was afraid of him. R.E.R. also told her that no one would believe her if she did tell. She never saw R.E.R. have sexual contact with her two younger sisters. The family moved from Germany to Cullman and then, except for her brother, to Kansas. Her brother stayed in Cullman and lived with an uncle. When M.D. was in the seventh grade her family moved from Kansas back to Cullman. The rapes continued in Cullman. M.D.’s mother continued to be involved. Her mother dressed M.D. in lingerie for R.E.R. On one occasion, when M.D. was 14 years old, she began to cry and talk her way out of having sex with R.E.R. On that occasion, her mother made R.E.R. stop. M.D. heard R.E.R. and her mother arguing afterward, but there were no more sexual assaults after that. M.D. testified that “the hardest thing that [she has had] to deal with is the fact that [her] mother did not protect [her] from [R.E.R. M.D., b]eing a mother of two kids, ... could not imagine letting someone do that to [her] children.” (R. 97.)
On cross-examination, M.D. testified that, other than the sexual activity, her parents took good care of her when she was growing up. As a young adult, M.D. lived with her parents whenever she needed to. M.D. left her two young daughters at R.E.R.’s house when she worked. Her oldest daughter, who was born in 2001, has spent the night at R.E.R.’s house. M.D. paid her mother to come to M.D.’s house to watch her girls while M.D. worked. M.D. and R.E.R. traveled together when she worked for him as an “escort driver” when he moved mobile homes for a living. (R. 109.) She said she was not “uneasy” about traveling alone with her stepfather because the sexual abuse had stopped when she was 14 years old. (R. 109.)
K.R. is R.E.R.’s wife and M.D.’s mother. She was R.E.R.’s codefendant. She was subpoenaed by the State to be a witness. She filed a motion to quash the subpoena and she claimed her Fifth Amendment right under the United States Constitution not to testify. The trial court ruled that she was “unavailable for trial.” (R. 113.)
Phillip Bray is a lieutenant in the Cull-man County Sheriffs Department who investigated M.D.’s accusations against R.E.R. He testified that during his investigation of M.D.’s accusation, he spoke with witnesses who corroborated what M.D. said R.E.R. had done to her. Because of the nature of certain accusations, Lt. Bray attempted to schedule an interview with M.D.’s mother, K.R., at a time he believed R.E.R. would be out of town. However, R.E.R. arrived at the interview location with K.R. According to Lt. Bray, R.E.R., “tried to prevent [K.R.] from coming in for an interview stating that she wasn’t going anywhere without him being present with her.” According to Lt. Bray, when he informed R.E.R. that K.R. was going to be interviewed outside R.E.R.’s presence, R.E.R. “began yelling, [he] became very irate, [he] started yelling at [K.R., telling her] don’t say anything, don’t do anything, don’t tell them.” (R. 119.) However, because K.R. invoked her right to counsel, the interview was postponed until the following day. K.R. was interviewed at a later time outside R.E.R.’s presence.
Before Lt. Bray began the interview, M.D.’s younger sister, S.B., asked to speak with K.R. S.B. consented to having the conversation recorded. After about a 15-minute conversation, S.B. left and Lt. Bray interviewed K.R. When K.R.’s interview *1198 with Lt. Bray concluded, S.B. returned to the room and spoke with her mother for a second time. The interview between Lt. Bray and K.R. and the two conversations between K.R. and S.B. were video-recorded on compact disc in what became the State’s Exhibit 2-A.[3] This exhibit was admitted into evidence over R.E.R.’s objection that the video recording contained K.R.’s inadmissible hearsay testimony— “an out-of-court statement offered for the truth of the matter asserted.” (R. 125.)
The recording was played for the jury. It showed S.B. and her mother in very emotional states. K.R.’s display of anguish, apparent shame, and remorse over the circumstances and her fear of R.E.R. was compelling. S.B. repeatedly told her mother how much she loved her, how much her mother was wanted and needed at home, how S.B. and the other children knew that K.R. bore no blame because they knew how controlling R.E.R. was, how K.R. was a victim of R.E.R.’s just as the children were, and how M.D. had already forgiven K.R. because M.D. knew R.E.R. was to blame. K.R. clearly believed that R.E.R. would kill her if she talked to the police, and S.B. pleaded with K.R. not to be afraid and to tell Lt. Bray the truth. When Lt. Bray did begin questioning K.R. she curled up in a fetal position in her chair and at times her hands were visibly shaking. At times she stated that an operation had caused her memory to fail and that she could no longer remember everything, at other times she acknowledged wrongdoing. Lt. Bray asked K.R. how she knew bad things had happened to her children if she could not remember. K.R. replied that she did not believe that M.D. would lie. K.R. begged Lt. Bray not to tell R.E.R. that she had talked to him. She told Lt. Bray to leave her in jail because she did not want R.E.R. to do anything bad to her children or to her. K.R. was so upset at this point that she was physically unable to speak, and Lt. Bray had to stop the interview for a few moments. K.R. stated that she had been sexually abused at some point in her life but she was too emotional to discuss this with Lt. Bray.
When Lt. Bray concluded the interview, he left the room and S.B. returned. At this time S.B. stated that she knew that R.E.R. had forced K.R. to have sex with him at times when she did not want to, and this, S.B. stated, was the same as rape. S.B. told her mother that M.D.’s husband had not wanted his children (KR.’s grandchildren) “to be around a child molester” in reference to R.E.R., but things would be different if R.E.R. was not there. (State’s Exhibit 2-A.) K.R. stated that R.E.R. told her that he had changed. In response to this, S.B. stated “[I]t don’t matter, mama, he did it,” to which K.R. stated, “I know it.” (State’s Exhibit 2-A.) Following this comment S.B. made a reference to having seen photographs on R.E.R.’s cell phone. The implication was that the photographs were in some fashion unwholesome. S.B. also told K.R. that K.R. was going to be given some medicine before K.R. had a nervous breakdown. S.B. assured her mother that S.B. was going to tell the truth but that she “didn’t know nothing was going on.” (State’s Exhibit 2-A.) S.B. then repeated that M.D. said— that she did not want her mother arrested; she wanted R.E.R. to be arrested. According to S.B., M.D. said that “she did not want [her mother] to get arrested. She wanted daddy to. She said you were a victim, and you are, that daddy made you do it or you wouldn’t have done it.” (State’s Exhibit 2-A.) K.R. replied, “I still have to pay like your daddy does cause I *1199 was in on it (inaudible).” (State’s Exhibit 2-A.)
After the recording was played for the jury, R.E.R. renewed his objection to the admissibility of the recording. He argued on this occasion that its admission violated the Confrontation Clause of the United States Constitution. This objection was overruled. R.E.R. argued that he was being denied his right to cross-examine K.R. The trial court told R.E.R. that he was “free to call [K.R.] as a witness if [he] would like.” (R. 130.)
On cross-examination, Lt. Bray was asked whom he had spoken to as part of his investigation. He stated that he had spoken with R.E.R.’s daughter from a previous marriage. He then stated, “who related that she had been sexually — ” before being cut off by defense counsel. (R. 133.) There was no motion to strike.
M.D.’s older brother, D.R., testified that he had been employed in law enforcement for the past 14 years and that he was currently employed as a patrol lieutenant with the Hanceville Police Department. He testified that he was married and the father of six children. K.R. is his mother and R.E.R. is actually his stepfather, but R.E.R. had adopted D.R. D.R. testified that he was six or seven years old when his mother married R.E.R. At this time M.D. would have been four of five years old. D.R. stated that while the family was living in Germany, when he was about 10 years old and M.D. was about 7 or 8 years old, R.E.R. made him have sexual intercourse with M.D. while his mother and R.E.R. had sex in the same room. D.R. also testified that R.E.R. made him have sex with his mother. D.R. stated that on one occasion he was having sex with M.D. and R.E.R. was having sex with K.R.,' and R.E.R. made them switch sexual partners. D.R. also stated that, more than once, he saw R.E.R. have an “inappropriate” encounter with M.D. (R. 145.) D.R. stated that R.E.R. was a very “authoritative person” and was “strict in his discipline.” (R. 145.) If M.D. or D.R. misbehaved or defied R.E.R. they would “get beaten” with a belt from their ankles up to their necks. (R. 145.) The beating would leave stripes and bruises. R.E.R. told D.R. not to talk about the sexual activity in the house because R.E.R. and his mother would get into trouble. D.R. was afraid of his father. When the family returned to the states, they lived in Cullman, but eventually all but D.R. moved to Kansas. D.R. stayed in Cullman with his uncle. D.R. was 12 or 13 at the time, and he wanted to get away from R.E.R. and to play football in Cull-man. D.R. was not abused by R.E.R. after that. The family moved back to Cullman after a couple of years. D.R. did not have a consistent relationship with his family after they returned. D.R. stated that he came to be a witness because he was contacted by Lt. Bray. D.R. testified that he had no doubt about any of M.D.’s allegations because he also had lived it.
On cross-examination, D.R. testified that while the family was in Germany he was given a tent. There was no sexual activity associated with the tent. D.R. stated that he recalled engaging in sexual activity with M.D. one time apart from the presence of his parents, but they did not get caught. He never had sex with his mother without his father being present. He stated that he did not get into trouble regarding sex with anyone outside the family. He never told what was happening in the house. D.R. told his wife about four years before the trial but only because his wife and M.D. had already talked about it while he was a soldier deployed to Afghanistan.
The State rested its case, and R.E.R. moved for a judgment of acquittal on the grounds that the State did not make a prima facie case. The motion was over *1200 ruled. Before the defense began its case, R.E.R. renewed his motion for a judgment of acquittal, arguing that the State did not establish jurisdiction because neither M.D. nor D.R. testified to any sexual acts having occurred in Cullman County. This motion was denied. R.E.R. then objected to the admission of the video recording of K.R. on the grounds that the content of the video recording was “testimonial evidence” and, as such, violated his right to confront the declarant, K.R., a violation of Crawford v. Washington, 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004), and Melendez-Diaz v. Massachusetts, 557 U.S. 305, 129 S.Ct. 2527, 174 L.Ed.2d 314 (2009). Moreover, R.E.R. continued, the prejudice to R.E.R. in admitting the video recording far outweighed the probative value to the State. The renewed motion was overruled, and the defense began its case.
M.D.’s younger sister, S.B., was 28 years old when she testified. K.R. is her mother and R.E.R. is her biological father. S.B. testified that she spoke with her mother in a small room in a detective’s office before her mother gave a statement to Lt. Bray. She knew the conversation was being recorded. S.B. explained that she said bad things about her father on that occasion because she and her father were in a fight with one another concerning the action she should take in her own child custody case.[4] Therefore, before her parents went to the detective’s office she and her “daddy were already kind of on the outs.” (R. 177.) S.B. testified that she did not remember telling her mother “that she needed to admit that anything that she did was not of her own free will.” (R. 177.) She stated that Lt. Bray had just told her that M.D. and D.R. had said that her parents were guilty and she “couldn’t think straight. It hurt [her] because [she] didn’t think that they[5] did that.” (R. 177.) S.B. said that K.R. had told her that R.E.R. had forced her to do things to M.D. S.B. said that her mother tried to shoot herself when M.D. first alleged that R.E.R. was “supposedly” doing stuff to her. S.B. stated that she “didn’t know if he did.” (R. 178.) S.B. testified that R.E.R. never touched her “in a sexually-inappropriate way.” (R. 178.) She said, “I thought I had a normal family. I had a happy family.” (R. 178.) S.B. said her father was strict and when she misbehaved he spanked her with a belt. She said he aimed for her “butt,” but because she jumped around he sometimes struck her back. S.B. said the only time she was bruised from a spanking was when her Uncle D. spanked her. S.B. stated that after M.D. was grown, M.D. and her two daughters moved back into R.E.R.’s house “plenty of times.” (R. 181.) S.B. stated that when M.D. was living at their parents’ house, she would leave her daughters in the care of her mother and father. According to S.B., even when M.D. was not living with her parents, her parents would watch M.D.’s first born, H.D., at their house while M.D. worked. H.D. spent the night there a lot and “loved staying the night there.” (R. 182.) S.B. believes that H.D. loves both her grandparents. S.B.’s parents were authorized to pick H.D. up from day care, and they did pick her up from time to time when M.D. had to work overtime. S.B. has never seen either of her parents mistreat their grandchildren. S.B. stated that her son “loves his papa,” a reference to R.E.R. (R. 182.) S.B. has *1201 not spoken with M.D. for 16 months— since M.D. made these accusations.
On cross-examination, S.B. stated that her father had always helped her financially. On the video recording, S.B. told her mother that “[her mother] was a victim too. [S.B.] said it was not [her mother’s] fault.” (R. 186.) S.B. stated, “Daddy has always been controlling over you.” (R. 186.) At trial, S.B. explained that she made those statements based on what she had been told. She testified that her mother had always told her that R.E.R. was controlling. S.B. testified that she did not know this as a fact. S.B. was also questioned about her video statement, “my momma’s deathly scared of my daddy.” (R. 186.) S.B. explained at trial that she made this comment because her mother had told her that her daddy was mean and that her mother was afraid of him; however, S.B. testified that “I ain’t never seen it.” (R. 186.) S.B. testified that “[she] didn’t know why” her mother was afraid of R.E.R. because S.B. had never seen any reason to be. (R. 187.) S.B. testified that she was “not really” afraid of R.E.R. (R. 187.) S.B. named her child R., Jr., in part after R.E.R. S.B. stated that she had heard that R.E.R. and her mother had molested her brother, D.R.; however, she testified that “I don’t know if it’s true or not because nothing’s ever happened to me. I ain’t seen nothing like that.” (R. 189.) She testified that she made claims in the past about R.E.R. doing “things” to her, but she asserted that she made those claims only when she was fighting with R.E.R. and to get attention. (R. 189.)
R.E.R. was 60 years old at the time of his trial. He testified that the charges against him were not true. He stated that while the family was living in Germany he caught M.D. and D.R. having sex. He said it made him angry and he whipped them harder than normal. He said he punished the children by spanking their bottoms with a belt, but he never whipped them from the neck to the ankles.
R.E.R. stated that D.R. was given a tent as a gift. The neighborhood children played with his children in the tent. One day his wife told him that M.D. had told her that the boys play “hide and go get it” with the girls. According to M.D., that meant that the girls hide and whatever boy finds them “get[s] it,” referring to sex. (R. 206.) After that, R.E.R. took the tent away. Also, while the family was living in Germany, D.R. was going around the neighborhood telling his friends that he and his mother had sex. According to R.E.R., K.R. admitted to him that she had had sex with D.R. twice and that she promised to stop. R.E.R. stated that D.R. did not go to Kansas with the family, but stayed with his uncle because R.E.R. wanted to separate him from his mother and because D.R. wanted to stay in Cull-man and play football.
R.E.R. testified that he and K.R. did have sex outside their marriage — as “swingers” — on two different occasions but they were in their 20s and children were not involved. (R. 288.) R.E.R. stated that M.D. drove an escort vehicle for him when his job was moving mobile homes. They were together extended periods and shared a room on these trips. There was never any inappropriate contact, and he never heard of any complaints from her. R.E.R. stated that M.D. probably has lived with R.E.R. and K.R. most of her adult life — more than she has lived by herself. He and his wife have babysat for M.D.’s daughter, H.D., on many occasions, and she has spent the night at their house many times. “[H.D.] grew up in our home up to five years old” he said. (R. 224.) M.D.’s youngest daughter, B.D., has also stayed with them and spent the night. His son’s children have also stayed and *1202 spent the night. R.E.R. stated that he has always provided financial assistance to all his children.
On cross-examination, R.E.R. stated that he sent his brother-in-law a letter written while R.E.R. was in jail. R.E.R. read the letter in court. In the letter R.E.R. states that as long as neither he nor K.R. testified against the other, they could not be convicted. R.E.R. basically says in the letter that K.R. is innocent. However, by way of explanation, R.E.R. stated that he was not being honest with himself about K.R. when he wrote the letter.
The defense rested and renewed its motion for a judgment of acquittal. The motion was denied.
R.E.R. appealed. I agree with the majority’s ruling that R.E.R. did not timely preserve his claim on appeal that the Confrontation Clause was violated. I disagree with the majority’s holding that admitting the video recording of K.R. was not reversible error because K.R.’s statements were cumulative to other properly admitted similar evidence, and, thus, the admission was harmless error.
There does not appear to be a dispute that the video recording contained statements of K.R., who was a nontestifying codefendant, asserting that R.E.R. was guilty. As R.E.R. correctly argued in his brief:
“[I]t is well settled that a nontestifying codefendant’s statement to police implicating the accused in the crime is inadmissible against the accused; it does not fall within any recognized exception to the hearsay rule and, absent showing of reliability, its introduction violates the accused’s confrontation rights.”
Jackson v. State, 791 So.2d 979, 1024 (Ala.Crim.App.2000) (citations omitted); Hillard v. State, 53 So.3d 165, 168-69 (Ala.Crim.App.2010). On appeal, R.E.R. specifically points out that, on the recording K.R.,
“acknowledged that Deputy Bray had been telling the truth when he was discussing the facts underlying the charges against R.E.R. Moreover, during her conversation with S.B., when S.B. said, ‘It don’t matter, mama, he did it’, K.R. replied, T know it.’ ”
(R.E.R.’s brief, at p. 17.) R.E.R. argues that “[t]hese statements are weighty statements against R.E.R.’s interest and inculpate R.E.R. alone. As such, pursuant to Jackson, the inculpatory statements of K.R. do not fall within an exception to hearsay.” (R.E.R.⅛ brief at p. 17.)
“ ‘ “The standard for determining whether constitutional error is harmless is whether the court can ‘declare a belief that it was harmless beyond a reasonable doubt.’ Chapman v. California, 386 U.S. 18, 24, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967).” ’ ”
Lewis v. State, 889 So.2d 623, 649-650 (Ala.Crim.App.,2003) (quoting Baker v. State, 906 So.2d 292 (Ala.Crim.App.2005), reversed on other grounds Ex parte Baker, 906 So.2d 277 (Ala.2004)).
In determining whether constitutional hearsay error is harmless, the majority cites Featherston v. State, 849 So.2d 217 (Ala.2002).
“In Featherston v. State, 849 So.2d 217 (Ala.2002), in assessing harmless error, the Alabama Supreme Court stated:
‘“[T]he factors to be considered include “ ‘ “ ‘[1] the importance of the [declarant’s] testimony in the prosecution’s case, [2] whether the testimony was cumulative, [3] the presence or absence of evidence corroborating or contradicting the testimony of the [de-clarant] on material points, ... and [4] the overall strength of the prosecution’s case.’ ” ’ ” Baker v. State, 906 *1203 So.2d 210, 240 (Ala.Crim.App.2001) (quoting James v. State, 723 So.2d 776, 782 (Ala.Crim.App.1998) (in turn quoting Delaware v. Van Arsdall, 475 U.S. 673, 684, 106 S.Ct. 1431, 89 L.Ed.2d 674 (1986))).’
“849 So.2d at 222. Furthermore,
“ ‘[i]t is well settled that “testimony that may be inadmissible may be rendered harmless by prior or subsequent lawful testimony to the same effect or from which the same facts can be inferred.” White v. State, 650 So.2d 538, 541 (Ala.Crim.App.1994), overruled on other grounds, Ex parte Rivers, 669 So.2d 239 (Ala.Crim.App.1995). See also Dawson v. State, 675 So.2d 897, 900 (Ala.Crim.App.1995), aff'd, 675 So.2d 905 (Ala.1996)(“The erroneous admission of evidence that is merely cumulative is harmless error.”); Thompson v. State, 527 So.2d 777, 780 (Ala.Crim.App.1988) (“Testimony which may be apparently illegal upon admission may be rendered prej-udicially innocuous by subsequent or prior lawful testimony to the same effect or from which the same facts can be inferred.”).’
“Jackson v. State, 791 So.2d 979, 1013-14 (Ala.Crim.App.2000).”
The majority found the two inadmissible hearsay statements specifically challenged in R.E.R.’s brief to be cumulative to M.D.’s testimony that R.E.R. had sexually assaulted her while the family lived in Cull-man and cumulative to S.B.’s testimony that K.R. stated that R.E.R. had forced K.R. to participate in raping M.D. The majority asserts that S.B. and Lt. Bray corroborated M.D.’s testimony, but the majority does not specifically address whether KR.’s (the declarant) hearsay testimony, was corroborated. Thus, having found K.R.’s hearsay statements to be cumulative to M.D.’s testimony and M.D.’s testimony corroborated by other evidence, the majority concludes that “any error in admitting K.R.’s recorded statement was harmless error. Accordingly, it does not appear that the error complained of has probably injuriously affected R.E.R.’s substantial rights, and thus we find no reversible error.”
I do not believe that cumulative evidence is a talisman for finding harmless error because, as Featherston suggest, not all cumulative evidence is harmless. All the factors listed in Featherston must be evaluated before determining that it is beyond a reasonable doubt that R.E.R.’s substantial rights were not injuriously affected by the admission of this hearsay evidence.
I believe that KR.’s testimony was very important to the State’s case against R.E.R. (the first Featherston factor). K.R. was allegedly a participant in the crimes against M.D., and, thus, along with R.E.R. and M.D., knew the truth about what had transpired between these individuals. K.R. added further to the list of R.E.R.’s alleged bad acts or crimes by confirming S.B.’s assessment that R.E.R. had essentially raped K.R. whenever he wanted to. She essentially placed all the blame on R.E.R. and presented herself as another of his victims. Moreover, it must be noted that it was in KR.’s penal interest to establish that she was also R.E.R.’s victim because it lessened KR.’s culpability for the crimes and placed more culpability upon R.E.R.
KR.’s statements were corroborated by M.D. and by D.R. (the third Featherston factor). However, their testimony, as discussed below, was not beyond question. There was evidence contradicting KR.’s testimony on material points. R.E.R. denied the criminal accusations against him. R.E.R. testified that he did not rape M.D. He stated that he had caught D.R. having *1204 sex with M.D. R.E.R. testified that K.R. was having sex with D.R. He further testified that the game “hide and go seek” was a sex game D.R. and his friends played that had nothing to do with R.E.R.
S.B. testified at trial that she had not seen any inappropriate sexual activity in R.E.R.’s house or any physical abuse in R.E.R.’s house. She testified that R.E.R. had never touched her “in a sexually-inappropriate way.” (R. 178.) She said, “I thought I had a normal family. I had a happy family.” (R. 178.) S.B. testified at trial that she did not know why her mother was afraid of R.E.R. because S.B. had never seen any reason to be afraid of him.
M.D. undermined her own testimony when she testified that what hurt her the most was that her mother, K.R., had allowed R.E.R. to abuse her. Nevertheless, M.D. had no reservations about allowing her two young daughters to stay in the household with R.E.R., and her children were allowed to spend the night in R.E.R.’s house.
D.R. testified that he had had consensual sex with his sister, M.D.
I cannot find that the overall strength of the prosecution’s case (the fourth Feather-ston factor) was great. This case was entirely dependent on who the jury found credible.
There was cumulative testimony presented in this case in the sense that the State presented the testimony of M.D., who stated that R.E.R. had had sex with her, and the State presented the testimony of Lt. Bray and D.R., who testified that they believed that R.E.R. had had sex with M.D., but it was not an established fact that R.E.R. had had sex with M.D. Thus, because the alleged cumulative testimony was not cumulative to an established fact, I believe it is a weak factor in determining harmless error.
Here, the jury heard conflicting testimony regarding R.E.R.’s guilt. The jury’s credibility choices, i.e., the weight given to the evidence, was the key to reaching its verdict. Because the judgment depended on the credibility of the witnesses, admitting KR.’s hearsay testimony, which essentially portrayed R.E.R. as a bad tempered, controlling, sexual predator, tended to bolster the credibility of the State’s witnesses. I do not believe this permits the evidence to be defined as harmless error. Therefore, I respectfully dissent.
KELLUM, J., concurs.

. R.E.R. was convicted under § 13A-6-61, Ala.Code 1975, was sentenced to 75 years in prison, was ordered to pay a $60,000 fine, court costs, and a $10,000 crime-victims-compensation assessment. The circuit court also ordered R.E.R. to register as a sex offender.

. At the time of the alleged crimes, the victim's initials were S.M.L. She has since married and was introduced at trial by her married name, her initials now being M.D.

. This exhibit was originally numbered as the State’s Exhibit 2, but later changed to 2-A.

. S.B.'s child was removed from her primary care based on a complaint filed after R.E.R.'s arrest claiming that the child was being sexually abused by R.E.R. However, S.B. contends that it was the child’s father who abused the child.

. It is unclear to whom she was referring by “they” — M.D. and D.R. or R.E.R. and K.R.