BURKE, Judge.
Ocíe Lee Lynch was convicted of six counts of capital murder: four counts of murder for hire or pecuniary gain, see § 13A-5-40(a)(7), Ala.Code 1975; and two counts of murder during a burglary, see § 13A-5^0(a)(4), Ala.Code 1975. Thereafter, a sentencing hearing was held and the jury returned an advisory verdict recommending, by a vote of 10 to 2, the death penalty. A separate sentencing hearing was held before the trial judge, who sentenced Lynch to life imprisonment without the possibility of parole.
On July 27, 2011, at around 7:00 in the evening, Officer Jason Jenkins, of the Tar-rant City Police Department, was called to the scene of a burning vehicle at property owned by CSX Railroad. A set of keys was found near the burned vehicle. Some papers that were in the trunk did not fully burn and contained sufficient information to help officers determine that the vehicle belonged to Robert Blake Lazenby, who resided in Sylacauga. An officer was sent to do a “welfare check” on Lazenby, which he did and reported nothing unusual, but a second check on his residence revealed that the back door was opened and the glass had been broken out of it. (Supp. R. 300.) A search of the home exposed drawers pulled out, a chair knocked over, general disarray, and a great deal of blood in the kitchen. The victim was discovered in the corner of a breakfast nook by a police officer, who recognized him as a having been an attorney who practiced law in Talladega.
During the investigation of Lazenby’s murder, the Sylacauga Police Department received a tip from Cathy McCall, a sister of Lynch’s accomplice Calvin Haynes, concerning the offense. Investigator Mike McBurnett with the district attorney’s office met with McCall in Birmingham on January 10, 2012. McCall turned over a cellular telephone to Investigator McBur-nett, who made a computer disk (CD) of a conversation that had been recorded on the phone. A transcript of the conversation was also made,[1] as well as a transcript of McCall’s meeting with Investigator McBurnett when she gave him the phone.
*1134 Calvin Haynes, an accomplice, testified that he had agreed to testify for the State in return for a sentence of life imprisonment. Haynes testified that he met with Lynch several days prior to the offense and, after having spoken to Earnest Files, Jr., Haynes told Lynch that Files wanted Lazenby killed.[2] Haynes said that Lynch agreed to kill Lazenby and asked how much money he would be paid. According to Haynes, Files was contacted, and he agreed to pay $45,000[3] but stated that he did not have the total amount at that time. Lynch agreed to take part of the payment in the form of drugs, but Files stated that he did not have any drugs; he had only $2,000 at the time. Lynch and Haynes took the $2,000 and bought drugs. Files did not state why he wanted Lazenby killed. Files showed Haynes Lazenby’s house and Haynes gave Lynch the address.
Haynes testified that, on the day of the offense, Haynes took Lynch, Charles Hendrix, and two other people to get an automobile that belonged to one of the men. Haynes testified that Lynch was armed with a .38 caliber handgun. Lynch, Hendrix, and the other two people, including Lovell Jones, drove to Lazenby’s house to drop off Lynch and Hendrix so that they could wait for Lazenby to come home. Lovell Jones testified that she rode with them to Lazenby’s house and that Lynch and Hendrix were dropped off because they were supposed to kill a man. She stated that Lynch told Hendrix that he would kill the man and that Hendrix “didn’t have to do nothing.” (R. 481.) Haynes testified that, when Lynch returned, he told Haynes that he had shot Lazenby in the face through the glass in the door when Lazenby opened the door and that he had gone inside. According to Haynes, Lazenby asked for an ambulance, and Lynch had shot him again and had cut his throat. According to Haynes, Lynch had further stated that he took the victim’s wallet, cellular telephone, sunglasses, and truck. Haynes testified that he and Lynch then went to Tarrant City to burn the victim’s truck. Lynch threw the gun in a creek and burned his clothes because they were bloody.
Later, Lynch, Haynes, Files, and a few others were watching television together and saw a news account of the murder. Haynes said that Files “celebrated” and promised Lynch and Haynes the rest of the money; however, he never paid them any more money.
McCall, Haynes’s sister, testified that at the time of the offense Lynch was living in Birmingham with her, her children, and her uncle. She had known him for four or five years. On the evening of the murder, Lynch, Haynes, Hendrix, and Files were at McCall’s house, watching the news; a segment concerning the burning of Lazen-by’s vehicle in Tarrant City was broadcast. McCall testified that she heard Lynch state that he wanted his $85,000 for having committed the murder.
McCall testified that she had several conversations with Lynch at her home concerning the offense. Initially, Lynch told McCall that he had gone to Sylacauga with Haynes, but that Haynes had gotten *1135 scared and had turned around because he did not want “to do it.” (R. 327.) Lynch told McCall that he had killed Lazenby. He later told her that Haynes and he had gone to Sylacauga but had turned around and had not committed the murder. Finally, Lynch told her that he had gone to Sylacauga with Hendrix and the two had gone to Lazenby’s house. Lynch stated that Lazenby had shut a glass door in Hendrix’s face so Lynch had shot through the glass and hit the victim in his forehead. Lynch and Hendrix then entered the house, and Hendrix took a knife from a kitchen drawer and tossed it to Lynch. Lynch stabbed Lazenby, who pleaded for his life and begged him to call an ambulance. Lynch and Hendrix left the scene in Lazenby’s truck and threw the gun in a creek. Lynch told McCall that they took Lazenby’s truck to Tarrant City and had set it on fire.
Lynch talked to McCall about the offense on an occasion during which she used her cellular telephone to record the conversation. Lynch, McCall, and her uncle were present during the recording. She later gave the phone to Investigator McBurnett. She and her uncle verified at trial that the CD containing the recording from her cell phone and the transcript of that recording accurately reflected what they had heard during the conversation.
The forensic pathologist testified that Lazenby was alive and aspirating blood following three gunshots and that he was stabbed twice in the side of his neck. He was shot twice in the chest postmortem. He died from a stab wound in his neck.
Lynch did not introduce the testimony of any witnesses.
I.
Lynch argues that his motion for a mistrial based on alleged prosecutorial misconduct should have been granted. Lynch’s objection and motion were based on the admission into evidence of a copy of a recording made by McCall of a conversation as well as a transcript of that recording made by the State to aid the jury in listening to the recording. The conversation was'between Lynch, McCall, and her uncle. The CD containing the conversation was played and admitted into evidence, and the transcript was published to the jury. During McCall’s testimony on re-cross-examination, it was revealed that Lynch had left the room where the conversation had taken place during part of the recording. Thus, Lynch argued that the evidence was inadmissible hearsay and that the State either knew or should have known that it was inadmissible hearsay.
Lynch argues on appeal that the hearsay evidence was highly damaging and that the State’s case was otherwise weak; therefore, he argues, the court should have granted his motion for a mistrial.
The record reveals that defense counsel referred to page 16 of the transcript of the recording where it indicated “inaudible” by a statement made by McCall’s uncle. McCall confirmed that she believed that Lynch had left the room at that time. Defense counsel then moved to exclude the rest of the conversation as hearsay and to instruct the jury to disregard it. Defense counsel acknowledged that the defense had been provided with the recording and a transcript of the recording during discovery but explained that the defense had not been provided with the transcript that identified the speakers — rather than simply identifying the speaker as male or female — until the previous day. Defense counsel stated that he had not had an opportunity to compare the recording to the transcript until the CD was played for *1136 the jury and it seemed that Lynch had left the conversation.
The court held that the transcript and recording contained hearsay. The judge determined that the transcript should be altered to eliminate the hearsay and then admitted into evidence. The judge instructed the jury that this latter exhibit, the redacted transcript, was the total transcript and that anything beyond its end constituted hearsay and should be disregarded.
Defense counsel then moved for a mistrial based on alleged misconduct by the State because McCall was not previously made available and the hearsay was highly damaging. Defense counsel argued that curative instructions to the jury could not eradicate the harm resulting from the admission of the hearsay.
The court held that, because defense counsel had heard the recording before the jury was let in and had already received a copy of the redacted transcript, a mistrial was not warranted. Moreover, the court reassured, there had been no misconduct by the State. The transcript was redacted and admitted, and the CD, which had already been admitted, was altered to leave out the hearsay. Just prior to retiring for deliberations, the court instructed the jury as follows:
“I do need to tell you about two pieces of evidence that will come back. All of the evidence which if admitted and is due to go back with you will be sent to you. There will be two pieces of evidence, one will be the recording of the telephone-recorded conversation that you heard. This will be — there will be a substitute. The substitute that — the original recording was Exhibit Number 119. The substitute will be 125. And it will stop at a point short of what you heard. You may or may not know it and it may or may not matter to you, but I’m just telling you, as a matter of law you could not consider that. So if there’s something on that recording that you recall, you need to disregard that. That was presented to you improperly. It is considered by this Court after conferring with the attorneys as hearsay that you shouldn’t consider as part of your deliberations or as part of your verdict. Can everyone understand that? Is there any problem? Does anybody have any problem following that instruction?
“Also, in Exhibit Number 126, which is — you were able to take a — I think, a transcript of the recording and read it along. It will track what is cut off of the recording. It will also cut off[. Wje’re going to send that which was admitted and it will also remove that portion that you should not consider as being hearsay. Does everyone understand that? So if you remember anything that you read, I’m going to ask you to disregard that and remove it from your consideration. Don’t make it a basis of verdict or discussion or deliberation. Does everyone understand that?”
(Supp. R. 703-04.)
There is no indication of prosecuto-rial misconduct in this case. The transcript provided to the jurors was the same as the original transcript defense counsel was provided with during discovery, with the exception of the juror’s version identifying which of the three people present was speaking.[4] The original transcript identified the speaker only by gender. The second version was apparently made by a police officer as he listened to the recording. Although it is unclear when defense counsel was provided with the sec *1137 ond version, he had the recording that he could listen to and the first transcript to aid him.
“ ‘A mistrial is a drastic remedy to be used sparingly and only to prevent manifest injustice, and the decision whether to grant it rests within the sound discretion of the trial court.’ Talley v. State, 687 So.2d 1261, 1275 (Ala.Cr.App.l996)(citing Inmin v. State, 654 So.2d 86 (Ala.Cr.App.1994)); see also Grimsley v. State, 678 So.2d 1197, 1206 (Ala.Cr.App.1996).” Bryant v. State, 727 So.2d 870, 877 (Ala.Crim.App.l998)(stating where alleged prosecutorial misconduct in telling defense witness that she was being investigated caused her to be unavailable: “We find that a mistrial would have been too drastic a remedy, given the fact that the gist of Ms. Wilson’s testimony had already been established through the testimony of other witnesses.”). See also McArthur v. State, 591 So.2d 135, 140 (Ala.Crim.App.1991) (“Because the trial court sustained the objections of defense counsel and instructed the jury to disregard, and because some of the objected-to evidence had already been presented to the jury without objection, we find that the trial court did not abuse its discretion in denying the appellant’s motions for mistrial based on the alleged misconduct of the prosecutor.”); Henderson v. State, 612 So.2d 1256, 1260 (Ala.Crim.App.1992)(holding that trial court did not abuse its discretion by denying Henderson’s motion for a mistrial after the prosecutor showed the jury a pair of ladies’ panties that were never admitted into evidence: “““An error that might have been prejudicial in a close case does not require reversal when the evidence of the defendant’s guilt is strong. Further, in such a case the defendant must show that the trial court’s error was, in fact, prejudicial to him.’ ” ’ ”).
“In determining whether the accused was prejudiced by prosecutorial misconduct, “we must ordinarily give great deference to the ... judge’s handling of the alleged misconduct during the trial. The ... judge is ordinarily in a much better position to understand the circumstances surrounding the alleged misconduct and to evaluate its impact.’ United States v. Tham, 665 F.2d 855, 860 (9th Cir.1981).” Wysinger v. State, 448 So.2d 435, 439 (Ala.Crim.App.1983). The court in the present case found that there was no indication of prosecutorial misconduct and, that there was, therefore, no basis for a mistrial. This decision is supported by the record.
Moreover, although the portion of the conversation that occurred outside Lynch’s presence was hearsay, its admission was harmless error in this case. See Rule 45, Ala. R.App. P. (“No judgment may be reversed or set aside ... unless in the opinion of the court to which the appeal is taken or application is made, after an examination of the entire cause, it should appear that the error complained of has probably injuriously affected substantial rights of the parties.”).
In Featherston v. State, 849 So.2d 217 (Ala.2002), the Alabama Supreme Court, in assessing harmless error, stated:
“[T]he factors to be considered include ‘ “ ‘[1] the importance of the [declarant’s] testimony in the prosecution’s ease, [2] whether the testimony was cumulative, [3] the presence or absence of evidence corroborating or contradicting the testimony of the [declarant] on material points, ... and [4] the overall strength of the prosecution’s case.”” Baker v. State, 906 So.2d 210, 241 (Ala.Crim.App. 2001) (quoting James v. State, 723 So.2d 776, 782 (Ala.Crim.App.1998)(in turn quoting Delaware v. Van Arsdall, 475 *1138 U.S. 673, 684, 106 S.Ct. 1431, 89 L.Ed.2d 674 (1986))).”
849 So.2d at 222. Furthermore,
“[i]t is well settled that ‘testimony that may be inadmissible may be rendered harmless by prior or subsequent lawful testimony to the same effect or from which the same facts can be inferred.’ White v. State, 650 So.2d 538, 541 (Ala. Crim.App.1994), overruled on other grounds, Ex parte Rivers, 669 So.2d 239 (Ala.Crim.App.1995). See also Dawson v. State, 675 So.2d 897, 900 (Ala.Crim. App.1995), aff'd, 675 So.2d 905 (Ala. 1996)(‘The erroneous admission of evidence that is merely cumulative is harmless error.’); Thompson v. State, 527 So.2d 777, 780 (Ala.Crim.App.1988)(‘Tes-timony which may be apparently illegal upon admission may be rendered preju: dicially innocuous by subsequent or pri- or lawful testimony to the same effect or from’ which the same facts can be m-ferred.’).”
Jackson v. State, 791 So.2d 979, 1013-14 (Ala.Crim.App.2000).
In the present case, Haynes testified that Lynch agreed to commit the. murder in return for money or money and drugs. He testified that Lynch and he were initially paid $2,000 by Files for killing Laz-enby. Both Haynes and McCall testified that when a television account regarding the murder aired, Lynch told Files that he wanted the rest of the money-owed him for the murder. Jones testified that she was in the car with Lynch and Hendrix when they were dropped off to commit the murder. She also testified that Lynch told Hendrix that Lynch would kill the victim and that Hendrix did - not have to do anything. Haynes testified that when Lynch returned to Birmingham after the offense, he went -with Lynch to burn Lazenby’s vehicle and that Lynch was wearing Laz-enby’s sunglasses. The vehicle was found by police officers where it had been burned. Haynes also testified that Lynch had taken Lazenby’s cellular telephone and wallet. According to Haynes, Lynch burned the clothing he was wearing when he committed the murder because it was bloody. McCall testified that she had had several conversations with Lynch concerning the murder. Both McCall and Haynes testified that Lynch told them that he had shot Lazenby in the face by firing through the glass in the door. They testified that he told them that he had then entered Lazenby’s house where he stabbed him with a knife and shot him again while Lazenby begged him to call an ambulance. Haynes testified that he had seen Lynch with a .38 caliber handgun just before he left to commit the murder and both McCall and Haynes testified that Lynch told them that he had thrown the gun in a creek after the murder.
Although Lynch argues that McCall’s testimony was important to the State’s case, her testimony was cumulative of Haynes’s testimony and was corroborated by both Haynes and Jones. The State’s evidence was strong, and the hearsay evidence consisted of only approximately 3 pages of the 18-page transcript of the recorded conversation. The CD and transcript reveal that the hearsay portions consist of the same kind of comment contained in the preceding non-hearsay portions. Lynch and McCall had already discussed the offense and the circumstances of the planning of the offense. Moreover, Lynch had already admitted to shooting Lazenby in the forehead through the glass door and to catching the knife thrown to him by Hendrix who had gotten it out of a drawer in the kitchen. He had stated that he was to get half of $85,000 from Lazenby’s wife. The hearsay portions of the CD and transcript merely contained statements by McCall and her uncle reiterating that they *1139 would not have gotten involved and that Lynch should not have participated. They had previously made such statements while Lynch was present. Lynch suffered no prejudice by the jury’s having heard the hearsay portion of the CD that was also reflected in the transcript. Further, the court ordered the transcript redacted and the CD altered so as to omit the hearsay. The court then instructed the jury that it was to disregard the hearsay and to refrain from discussing it or making it part of the jury’s deliberations or verdict. Jurors are presumed to follow a trial court’s instructions. See Burgess v. State, 827 So.2d 134, 162 (Ala.Crim.App.1998).
Therefore, there was no error in the trial court’s denial of the motion for a mistrial.
II.
Lynch argues that the circuit court erred in denying his motion for a judgment of acquittal. Specifically, rather than challenging the sufficiency of the evidence, Lynch challenges the weight of the State’s evidence, contending that it was all circumstantial and that the witnesses were not credible. “However, evidence of criminal conspiracies hardly ever comes from ministers and civic leaders. The appellant can hardly complain of the unsavory character of the witnesses against him as they were all his chosen companions. The weight and credibility of the testimony was for the jury to determine.” Anderson v. State, 354 So.2d 1156, 1159 (Ala.Crim.App.1977).
“‘“The role of appellate courts is not to say what the facts are. Our role ,., is to judge whether the evidence is legally sufficient to allow submission of an issue for decision to the jury.” Ex parte Bankston, 358 So.2d 1040, 1042 (Ala.1978). An appellate court may interfere with the jury’s verdict only where it reaches “a clear conclusion that the finding and judgment are wrong.” Kelly v. State, 273 Ala. 240, 244, 139 So.2d 326 (1962). “The rule is clearly established in this State that a verdict of conviction should not be set aside on the ground of the insufficiency of the evidence to sustain the verdict, unless, after allowing all reasonable presumptions of its correctness, the preponderance of the evidence against the verdict is so decided as to clearly convince the court that it was wrong and unjust.” Bridges v. State, 284 Ala. 412, 420, 225 So.2d 821 (1969). Even though an appellate court should “marvel that a jury would convict upon such flimsy proof,” it is “not permitted to pass upon the weight or sufficiency of the evidence, where it may yield any rational inference of guilt.” Toles v. State, 170 Ala. 99, 100, 54 So. 511 (1911). A verdict on conflicting evidence is conclusive on appeal. Roberson v. State, 162 Ala. 30, 50 So. 345 (1909). “[W]here there is ample evidence offered by the state to support a verdict, it should not be overturned even though the evidence offered by the defendant is in sharp conflict therewith and presents a substantial defense.” Fuller v. State, 269 Ala. 312, 333, 113 So.2d 153 (1959), cert. denied, Fuller v. Alabama, 361 U.S. 936, 80 S.Ct. 380, 4 L.Ed.2d 358 (1960),’ Granger [v. State ], 473 So.2d [1137] at 1139 [ (Ala.Crim.App.1985) ].
“Where a defendant’s conviction is based solely on circumstantial evidence, ‘if the circumstances can be reconciled with the theory that someone else may have done the act, then the conviction is due to be reversed.’ Ex parte Brown, 499 So.2d 787, 788 (Ala.1986) (emphasis in original). ‘Circumstantial evidence alone is enough to support a guilty ver- *1140 diet of the most heinous crime, provided the jury believes beyond a reasonable doubt that the accused is guilty.’ White v. State, 294 Ala. 265, 272, 314 So.2d 857, cert. denied, 423 U.S. 951, 96 S.Ct. 373, 46 L.Ed.2d 288 (1975). ‘Circumstantial evidence is in nowise considered inferior evidence and is entitled to the same weight as direct evidence provided it points to the guilt of the accused.’ Cochran v. State, 500 So.2d 1161, 1177 (Ala.Cr.App.1984), affirmed in pertinent part, reversed in part on other grounds, Ex parte Cochran, 500 So.2d 1179 (Ala.1985). ‘It is not necessary for a conviction that the defendant be proved guilty to the “exclusion of every possibility of innocence.” ’ Burks v. State, 117 Ala. 148, 23 So. 530 (1898). ‘The facts and circumstances in evidence, if dissevered and disconnected, may be weak and inconclusive; but them probative force, when combined, as it was the province of the jury to combine them, under proper instructions from the court, may have satisfied them of the guilt of the defendant.’ Howard v. State, 108 Ala. 571, 18 So. 813, 815 (1895).”
White v. State, 546 So.2d 1014, 1017 (Ala.Crim.App.1989).
The weight of the evidence and credibility of the witnesses were matters to be determined by the jury. There was evidence indicating that Lynch shot and stabbed Lazenby in return for $2,000 and the promise of more from Files. There was also evidence indicating that Lynch shot Lazenby through the door as Lazenby closed it. Lynch then entered Lazenby’s house, shot and stabbed him, and took his cell phone, wallet, sunglasses, and vehicle. The State’s evidence was sufficient to submit the case to the jury.
III.
Although the error was not raised on appeal, this Court must notice any errors that have jurisdictional implications. Lynch was convicted of four counts of murder for hire or pecuniary gain— Count one, murder for hire by Earnest Files, Jr.; count two, murder pursuant to contract by Earnest Files, Jr.; count three, murder for hue by Calvin McCall Haynes; count four, murder pursuant to a contract by Calvin McCall Haynes — and two counts of murder during a burglary— count five, murder during the course of committing a burglary in the first degree, armed; and count six, murder during the course of committing a burglary in the first degree with physical injury. The first two convictions are for the alternative means of committing a murder for hire in violation of § 13A-5-40(a)(7), wherein the same victim was killed pursuant to a contract for hire by Earnest Files, Jr. The following two convictions are for the alternative means of committing a murder for hire in violation of § 13A-5-40(a)(7), wherein the same victim was killed pursuant to a contract for hire by Calvin McCall Haynes. The last two convictions are for the alternative means of committing murder during a burglary in violation of § 13A-5-40(a)(4). Because convictions for alternative means of committing the same offense violate the right to be free from double jeopardy, three of these convictions are due to be dismissed. “A single crime cannot be divided into two or more offenses and thereby subject the perpetrator to multiple convictions for the same offense. Const. of 1901, Art. I, § 9; U.S. Const. Amend. V; Vogel v. State, 426 So.2d 863 (Ala.Crim.App.1980), affirmed in part, writ quashed in part, 426 So.2d 882 (Ala.1982), cert. denied, 462 U.S. 1107, 103 S.Ct. 2456, 77 L.Ed.2d 1335 (1983).” Ex parte Darby, 516 So.2d 786, 787 (Ala.1987). See also Revis v. State, 101 So.3d 247, 335 (Ala.Crim.App.2011)(“Thus, the two counts of murder during robbery in the present *1141 case charged Revis with committing the same offense. Moreover, the fact that the sentences would have been served concurrently does not obviate the harm resulting from the unlawful conviction.”); Castillo v. State, 925 So.2d 284 (Ala.Crim.App.2005).
Therefore this case is due to be remanded to the circuit court for that court to enter an order adjudging Lynch guilty of one count of murder for hire by Earnest Files, Jr., one count of murder for hire by Calvin McCall Haynes, and one count of murder during a burglary. Due return should be made to this Court within 35 days of the release of this opinion.
REMANDED WITH DIRECTIONS.*
WINDOM, P.J., and WELCH, KELLUM, and JOINER, JJ., concur.

. The original transcript provided to the defense during discovery identified the speakers only as male and female. (Supp. R. 319.) A later version of the transcript was prepared by the State, in which the speakers were identified as Lynch, McCall, and her uncle, Leroy McCall.

. There was subsequent testimony that a white woman had asked that her husband be killed and had shown the people she was asking a bag of money that would later be payment for the killing. That information was included in a statement Haynes gave the police. There was also testimony from Laz-enby's attorney that Lazenby and his wife were getting a divorce and that his wife had filed some police reports concerning Files.

. There are varying numbers in the record regarding the amount offered for committing the murder.

. This Court has listened to the CD and the voices are easily discernible as a single female and two men with distinctly different voices.

 Note from the reporter of decisions: On May 27, 2016, on return to remand, the Court of Criminal Appeals affirmed, without opinion.